## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: | : CHAPTER 11 |
| | : |
| 400 WALNUT ASSOCIATES, L.P. | : |
| | : |
| DEBTOR(S) | : BANKRUPTCY NO. 10-16094  SR |

| | |
|---|---|
| 400 WALNUT ASSOCIATES, L.P. | : |
| PLAINTIFF(S) | : |
| VS. | : |
| | : |
| 4TH WALNUT ASSOCIATES, L.P., | : |
| IVY REALTY LII, LLC, AND | : |
| IVY REALTY SERVICES, LLC | : |
| DEFENDANT(S) | : ADV. NO. 10-0456 |

# OPINION

BY: STEPHEN RASLAVICH, CHIEF UNITED STATES BANKRUPTCY JUDGE.

*Introduction*

Before the Court is the Debtor's Objection to Proof of Claim No. 7-3 filed by

secured creditor 4th Walnut Associates, L.P. (4th Walnut).  The Objection is contained

within Count VIII of this adversary proceeding.  The Objection is opposed and a trial on

the matter was held on July 27, 2011.  Thereafter, Memoranda of Law were submitted

and the Court took the matter under advisement.  For the reasons which follow, the

Objection to the claim will be sustained in part and denied in part.[1]

---

[1]As this matter involves an objection to a claim, it is within this Court's core jurisdiction.
*See* 28 U.S.C. § 157(b)(2)(B) (designating as "core," allowance or disallowance of claims
against the estate)

*Summary of Holding*

Proof of Claim 7-3 will be allowed in the total amount of $ 12,620,867.57.[2]  It

consists of the following components:

| | |
|---|---|
| Principal | $  12,069,518.95 |
| Interest | $       624,484.40 |
| Late Charges | $       49,458.05 |
| Less Payments Made | $      (122,593.83) |
| Total Claim | $ 12,620,867.57 |

*The Proof of Claim*

The claim at issue is based on a Multi-Family Note, Mortgage, Assignment of

Rents and Security Agreement (Loan Documents).  Ex. 4.  It was filed in the amount of

$15,267,261.27, plus attorneys fees and costs.  *Id*.  It includes interest and other

charges which are itemized on a separate attached statement.  *Id.*  The claim is

secured by the Debtor's real property, the apartment building at 4th and Walnut Streets

in Philadelphia.[3]  *Id.* (the Property)

*History of the Loan*

Because much of the Debtor's challenge is based on events which transpired

---

[2]This is the amount of the claim as of the petition date.  The Debtor  brought forward its calculation of the claim to August 1, 2011.  Debtor's Br. 14.  In doing so it included post-petition interest and credited post-petition payments.  This is premature given that neither party has sought a determination of the value of 4th Walnut's secured claim.  Until 4th Walnut's status as an over or under secured creditor is established, the Court's ruling as to 4th Walnut's claim is perforce limited to the date of the bankruptcy filing.

[3]This a single asset real estate case as defined by § 101(51B) of the Bankruptcy Code. *See* Voluntary Petition, Case No. 10-16094

2

before 4th Walnut held the underlying loan, it is necessary to recount the pertinent factual background.

The claim derives from a 2004 loan made to the Debtor by Independence Community Bank (ICB).  Trial Tr. 9.  The amount of the loan was $13,125,000 and its purpose was to provide permanent financing for the Debtor's conversion of the Property from an office building to residential apartments.  *Id*.  In 2006, Sovereign Bank, N.A., (Sovereign) acquired ICB and with it the Debtor's loan.  *Id.* 10.  In November 2009, Sovereign notified the Debtor that it had defaulted under the loan.  Ex. 9.  In January 2010, Sovereign commenced foreclosure proceedings.  Ex. 10.  On June 18, 2010, Sovereign sold the loan to 4th Walnut.  Ex. 65.  On July 2, 2010, 4th Walnut informed the Debtor that it had purchased the loan from Sovereign and declared the Debtor in default.  Ex. 13.  On July 23, 2010, the Debtor commenced this Chapter 11 case.  *See* Voluntary Petition, Case No. 10-16094,

On December 18, 2010, the Debtor filed an eight count complaint against 4th Walnut.[4]  On January 10, 2011, 4th Walnut filed a Motion to Dismiss seven of the eight Counts.  On March 31, 2011, the Court granted the Motion in part, dismissing six of the seven challenged counts.  Presently before the Court is the sole count (Count VIII - Objection to Claim) for which dismissal was not previously sought.[5]

---

[4]The Complaint alleged various state common law causes of action, e.g., breach of contract, tortious interest with contract, tortious interference with prospective contract, etc.

[5]The challenged Count which survived the Dismissal Motion remains extant but has been bifurcated for later disposition so that the matter of liquidating the 4th Walnut indebtedness might be resolved expeditiously.

*Basis of the Objection*

The Debtor contends that the amount of 4th Walnut's claim is overstated.

Specifically, argues the Debtor, the amount of principal debt is inflated, the rate of

interest is incorrect, and other charges which were waived are included in the claim.

*See, generally*, Debtor's Brief.  4th Walnut correspondingly maintains that each part of

its claim is legitimate. *See, generally*, 4th Walnut's Brief.

*Comparison*

Below is a side-by-side comparison of the components of 4th Walnut's claim

against what the Debtor says is owed:

|                    | Proof of Claim   | Debtor            |
| ------------------ | ---------------- | ----------------- |
| Principal          | $13,200,754.35   | $11,984,927.52    |
| Interest           | $ 1,344,050.75   | $    617,827.07   |
| Late Charges       | $    714,394.71  | $      75,708.08  |
| Prepayment Premium | $       8,061.20 |                   |
| Total              | $15,267,261.01   | $12,678,462.67[6] |

*Burden of Proof*

The Third Circuit has explained that where an objection to a claim is contested,

the evidentiary burden shifts as the case develops:

> The burden of proof for claims brought in the bankruptcy
> court under 11 U.S.C.A. § 502(a) rests on different parties at
> different times.  Initially, the claimant must allege facts
> sufficient to support the claim. If averments in his filed claim
> meet this standard of sufficiency, it is "prima facie" valid. *In
> re Holm*, 931 F.2d 620, 623 (9th Cir.1991) (quoting 3 L.
> King, *Collier on Bankruptcy,* § 502.02, at 502–22 (15th

---

[6]Complaint ¶ 112.

4

> ed.1991)).  In other words, a claim that alleges facts
> sufficient to support a legal liability to the claimant satisfies
> the claimant's initial obligation to go forward.  The burden of
> going forward then shifts to the objector to produce evidence
> sufficient to negate the *prima facie* validity of the filed claim.
> It is often said that the objector must produce evidence
> equal in force to the *prima facie* case. *Id.; see In re Windsor
> Communications Group, Inc.*, 45 B.R. 770, 773
> (Bankr.E.D.Pa.1985).  In practice, the objector must produce
> evidence which, if believed, would refute at least one of the
> allegations that is essential to the claim's legal sufficiency.  If
> the objector produces sufficient evidence to negate one or
> more of the sworn facts in the proof of claim, the burden
> reverts to the claimant to prove the validity of the claim by a
> preponderance of the evidence. *See In re WHET, Inc.*, 33
> B.R. 424, 437 (Bankr.D.Mass.1983). The burden of
> persuasion is always on the claimant. [citations omitted]

*In re Allegheny Intern., Inc.*, 954 F.2d 167, 173–74 (3d Cir.1992).

*Debtor's Expert*

Before proceeding to the merits, the Court must address a threshold issue raised

by 4th Walnut.  It objects to the admission of certain testimony offered by Stephen

Scherf, the Debtor's expert witness.  4th Walnut's Reply Br. 29-35.  4th Walnut

maintained that Mr. Scherf lacked the qualifications to testify as to matters on which he

opined.  4th Walnut contends that his statements are therefore unreliable.  The Court

finds these concerns to be exaggerated.  Scherf has substantial educational

qualifications and professional experience relevant to this controversy.  In areas where

the Court found Mr. Scherf's testimony to be of some help (e.g, compounding of interest

and the default rate) the points were neither particularly complex, nor even disputed by

4th Walnut.  It is principally the legality of the charges at issue which has caused

disagreement.  On points where Mr. Scherf's qualifications may have reached their limit

(e.g., prevailing market rates) the testimony was either not relied on exclusively by the

5

Court, or it was supportive of 4th Walnut's position.  For example, as to the

reasonableness of a 16% default rate, the Court has credited Mr. Scherf's testimony as

to present market rates, but it relied on several other factors in reaching its ultimate

decision to deny that rate.

*Principal Debt*

As to the amount of principal debt due on the date of bankruptcy, the parties are

more than $1 million apart.  *Compare* Ex. 4 (Proof of Claim) with Ex. 1 (Complaint, ¶

111).[7]  Two factors explain why 4th Walnut's principal balance is so much higher: first, it

has compounded unpaid interest into the principal balance while the Debtor has not;

second, it has calculated unpaid interest at the higher, default rate of interest (16%)

while the Debtor has used the lower, contract rate (5%).

The Debtor does not dispute that the note provides for the addition of unpaid

interest to principal.[8]  Debtor's Br. 31.  Neither does it dispute that the agreement

provides for a default rate of interest.[9]  What the Debtor disputes is 4th Walnut's right to

capitalize interest and to charge default rate interest.  As to the compounding of interest,

the Debtor argues that because Sovereign never added interest to the principal balance,

4th Walnut *qua* assignee may not.  In other words, Sovereign waived the right to

compound.  As to default rate interest, the Debtor maintains that the rate is inequitable

---

[7]Curiously, 4th Walnut's Answer to the Complaint denies that allegation based upon a
lack of sufficient information and not based on contrary evidence.  *See* Answer, ¶¶ 111, 112.

[8]The note provides that unpaid interest is to accrue to principal.  *See* Note, ¶ 3(c).

[9]Default rate interest is provided for in ¶8 of the note.  Schedule B to the note provides
for a 16% default rate of interest.

under the circumstances of this case.  *Id.* 40-52.

*Waiver and the*
*Right to Compound*

On the issue of compounding, the Debtor's expert witness (Mr. Scherf) testified

that Sovereign never compounded interest.  Trial Tr. 94; *see also* Ex. 6 Scherf Expert

Rep.  6-7.  Mr. Scherf based that conclusion on the Sovereign Bank monthly loan

statements and the annual mortgage loan statements.  Ex. 6. Scherf Expert Rep. 6.

After the loan was purchased from Sovereign by 4th Walnut the latter commenced

compounding interest.  *Id*. 7.  Moreover, added Mr. Scherf, 4th Walnut not only

compounded interest going forward, but it retroactively calculated compound interest for

the time period *prior* to when it owned the loan and simply added that to its claim as well.

*Id*.  Debtor objects to the compounding of any interest—either before or prior to when 4th

Walnut held the loan—insisting that 4th Walnut is bound by Sovereign's decision not to

compound.  For its part, 4th Walnut admits that it has recalculated the claim as Debtor

contends.  Significantly, it cites <u>no</u> legal authority whatsoever for this rather extraordinary

conduct. It simply explains that it believes the note entitles it to do what it has done.

Trial Tr. 102-103

*4th Walnut's Limited*
*Right to Compound*

A decision by a party not to enforce one or more rights in a contract is not

dispositive of the question of whether such right has been waived absolutely.  In this

case, the note provides that any forbearance by the lender in exercising any right or

remedy under the loan documents shall not waive or preclude the exercise of such right.

*See* Ex. 7, Note ¶12.  For whatever reason, during the 15 months after the Debtor

defaulted under the note, Sovereign did not compound unpaid interest.  The Debtor

reads that to mean that the right to compound interest was waived absolutely.  4th

Walnut counters that a waiver has to be intentional to be enforced.  4th Walnut's Reply

Br. 8.

Under Pennsylvania law, "waiver is the intentional relinquishment of a known

right, claim or privilege." *Com. ex rel. Corbett v. Large*, 715 A.2d 1226, 1229

(Pa.Comwlth.1998).  To constitute a waiver of a legal right there must be a "clear,

unequivocal, and decisive act of the party with knowledge of such right and an evident

purpose to surrender it."  *Kingsly Compression, Inc. v. Mountain V Oil & Gas, Inc.*, 2010

WL 4929076, at *6 (W.D.Pa.Nov. 30, 2010)   A commercial lender such as Sovereign

certainly is presumed to be aware of its rights with regard to the accrual of interest.  Yet

it did not compound interest while it held the note.  *See* Ex. 14-55 (monthly bank

statements, Jan. 2007 to July 2010).    As assignee, 4th Walnut stands in the shoes of

the assignor (Sovereign) and so its rights rise no higher than Sovereign's.  *See In re

Nixon*, 400 B.R. 27, 35 (Bankr.E.D.Pa. 2008) (disallowing creditor's claim to default rate

interest for period when prior holder did not charge default rate), citing *Crawford Cent.

School Dist. v. Pennsylvania*, 888 A.2d 616, 619-620 (Pa. 2005).  Because Sovereign

waived its right to compound unpaid interest for the time it held the loan, 4th Walnut has

no right to reverse that decision.  *See In re Crystal Properties, Ltd., LP*, 268 F.3d 743,

747 (9th Cir. 2001) (finding it inequitable to allow present holder to recalculate interest for

period when predecessor did not and considering the right to have been waived);

*Harvest Oaks Drive Assoc., LLC*, 2011 WL 124495, at *11 (Bankr.E.D.N.C. Jan. 14,

2011) (following *Crystal Properties* in disallowing retroactive imposition of charges not

8

claimed by prior holder); and *In re Sweet*, 369 B.R. 644, 652 (Bankr.D.Colo. 2007) (disallowing assignee from retroactively charging default rate interest when prior holder had not).  As previously noted, 4th Walnut can point to no decision which expressly upholds this practice, which practice the Court finds to be avaricious and highly improper.[10]  4th Walnut's defense of its position consists only of attempts to distinguish precedents which have rejected it.  The Court finds these efforts wholly unpersuasive.

That does not mean, however, that Sovereign's waiver is without limits.  Just as it would be inequitable to allow 4th Walnut to reconfigure the amounts due prior to when it bought the loan, it would likewise be unfair to hold that 4th Walnut may not compound interest going forward.  The Court cannot draw the conclusion that Sovereign's failure to compound interest was the result of a comprehensive accord with the Debtor, such as might bind successors and assigns.  Indeed, one of the enduring mysteries of this case was what—exactly—was agreed upon by the Debtor and Sovereign at a January 2010 meeting during which the parties appear to have attempted a workout of the default under the note.  The parties' version of events, as to what *Sovereign* agreed upon, are sharply at odds.  The party in the best position to inform the Court as to what Sovereign intended after the January 2010 meeting is Sovereign itself.  For whatever reason, no testimony, nor any statement from Sovereign has ever been made part of the record. The upshot is that the record cannot support a finding that Sovereign bargained away

---

[10] On this score, the court notes, in particular, that in the Purchase and Assumption Agreement pursuant to which 4th Walnut bought the loan, Sovereign itself represented that the principal debt as of June 18, 2010 was $11,884,309.16.  (See Exhibit 65@ ¶ 9(L)).  Incredibly, 4th Walnut just disregards this fact.  Notwithstanding Sovereign's representation, 4th Walnut argues that the Bank simply got it wrong, and that after it bought the loan 4th Walnut was free to correct the Bank's "mistake" and recalculate the principal debt as described.  The Court finds this contention to be completely absurd.

the future right to compound interest.  Accordingly, 4th Walnut was at liberty to

compound interest after it purchased the note (June 18, 2010), but no earlier than that

date.

*Default Rate Interest*

Having determined that 4th Walnut may compound interest going forward, the

Court turns to the question of the interest rate.  4th Walnut's claim for default rate interest

is based on an express contract provision.  That is not disputed.  The Debtor

acknowledges that a claim for prepetition interest, if provided for in the parties'

agreement, is allowable subject to the equities of the case.  Debtor's Br. 39.  The

equitable benchmarks by which the Debtor believes that Court should be guided are the

following:

> 1.  The creditor faces a significant risk that the debt will not
> be paid;
>
> 2.  The lower rate of interest payable predefault is shown not
> to be the prevailing market rate;
>
> 3.  The difference between the default and the pre-default
> rates and whether the differential between the two rates is
> reasonable; and
>
> 4.  Whether the purpose of the higher interest rate is to
> compensate the creditor entitled to interest for losses
> sustained as a result of the fact that it was not paid at
> maturity, or is simply a disguised attempt to penalize the
> debtor.

Debtor's Br. 39-40 citing *In re Deep River Warehouse, Inc.*, 2005 Bankr. LEXIS 1251, at

*9 (Bankr. M.D.N.C. June 22, 2005).[11]  4th Walnut responds that the *Deep River* analysis

---

[11]4th Walnut is correct that the *Deep River* Court did not rely on this 4 part analysis but
only mentioned it as being followed in another jurisdiction.  The 4 part analysis is taken from

(continued...)

is inapposite for two reasons: first, because the decision is not binding authority in this

Circuit; and second, because the context in *Deep River* involved treatment of a secured

creditor's claim under a Chapter 11 plan.  *See* 4th Walnut's Reply Brief, 24.

While the Court agrees that *Deep River* is not controlling precedent, it disagrees

that the context is materially different.  This Court itself has had occasion to assess the

fairness of a claim for default rate interest in the context of Chapter 11 plan confirmation.

*See In re LaGuardia Associates, LP*, 2006 Bankr. LEXIS 4735 (Bankr. E.D.Pa. Sept. 1,

2006).  This court observed in *LaGuardia* that at least 3 distinct rules have been applied

by courts in dealing with the post-bankruptcy default rate interest claims of oversecured

creditors.  One line of authority leaves the question to applicable non- bankruptcy law,

while another considers it as akin to an administrative expense or "charge" under section

506(b).  *Id*. at **110-111.  The third line—and the one adopted by this Court in

*LaGuardia*—reasoned that the Bankruptcy Code gives the court the equitable power and

duty to examine the circumstances of the claim in each particular case and to consider

notions of fairness and equity in determining whether to award default rate interest.

*LaGuardia* at *111 *citing In re Terry Limited Partnership*, 27 F.3d 241, 243 (7th Cir.

1994).  As a practical matter, these considerations are no different from the four factors

which the Debtor cites.  They involve the risk of default as well as the reasonableness of

the default rate; that is, both in terms of the rate *per se* as well as compared to market

rates.  One additional factor employed in *LaGuardia* expands the inquiry by considering

---

[11](...continued)
*In re W.S. Sheppley & Co.,* 62 B.R. 271 (Bkrtcy.N.D. Iowa 1986).  Because the Court will utilize
a similar methodology which it has previously itself employed to determine a claim for default
rate interest, the point is immaterial.

the effect of the higher rate on the Debtor's ability to reorganize.  That consideration,

indirectly, impacts what unsecured creditors might recover on their claims.  *LaGuardia*,

at \*115.  In sum, this is an equitable analysis which concerns all interested parties in the

bankruptcy case.

*Risk*

The Court notes that a default interest rate provision is commonly included in

mortgage transactions.  It is intended to cover the additional but unforeseeable costs

associated with a defaulting borrower.  *LaGuardia*, at \*112 citing *Terry, supra* at 244.

Where this function is not implicated there is the risk that a default rate may function as

a coercive penalty.  In such cases, courts have held that it would be inequitable to allow

its impact to destroy a debtor's opportunity to reorganize.  *See, e.g., In re Dixon*, 228

B.R. 166, 175 (W.D.Va. 1998).  Equally, other courts are sensitive to the harm that the

higher rate might visit upon other creditors.  *See, e.g. In re Process Property Corp.*, 327

B.R. 603, 609 (Bankr.N.D.Tex. 2005).

At the outset, the Court observes that the default rate herein clearly does not

serve the traditional purpose of compensating a lender for the "additional but unforseen

costs associated with a defaulting borrower."  That cannot be credibly denied, as the

loan was in default when 4th Walnut purchased it.  The associated costs would certainly

have been factored into the purchase price by a sophisticated investor such as 4th

Walnut.  Indeed, its purchase price was 72 cents on the dollar.  Significantly, 4th

Walnut's Chief Investment Officer testified that it expected to earn a substantial profit

from its investment, ranging from a low of $3 million to as high as  $11 million.  Trial Tr.

120-124.  Allowing default rate interest, in this instance, would unquestionably confer an

12

enormous windfall on 4th Walnut.

But even assuming the risk of a negative return, 4th Walnut cannot be heard to argue that the contract rate is below market.  The Debtor's expert credibly testified that the current mortgage rates for apartment building loans tend to track home mortgage rates.  *See* Ex. 6 Scherf Expert Rep. 9; *see also* Ex. 69, Scherf Dep. 98.  4th Walnut offered no independent evidence on that score.  The record leads the Court to conclude that the subject default rate is excessive.  Indeed, the increase from the contract rate (5%) to the default rate (16%) is more than 200%.  The default rate bears no rational relationship to the situation in which 4th Walnut finds itself.  The default rate appears clearly to be less a means of compensation and more in the way of a penalty.

Moving beyond this, the effect of allowing the default rate has critical ramifications for the Debtor's ability both to reorganize itself and to make a meaningful distribution to other creditors.  The Debtor's principal testified credibly that the Debtor cannot confirm a Plan of Reorganization if 4th Walnut's claim to default rate interest is allowed.  Trial Tr. 32.  This testimony was uncontroverted.  Even if it were otherwise, paying the heightened rate would shift substantial funds otherwise available to pay unsecured creditors.  *Id.* 32-33.  In short, the inclusion of default rate interest here would foreclose the prospect of a reorganization and, as a corollary, prejudice junior creditors. Accordingly, to the extent that the outstanding principal balance of 4th Walnut's claim includes unpaid interest calculated at the default rate, it will be disallowed.

*Calculation of Prepetition*
*Principal Balance*

Having determined the extent to which interest may be capitalized, and at what rate, the Court calculates the principal balance of 4th Walnut's claim to be

$12,069,518.95 as of the petition date.  It arrives at this figure, as follows: both parties'

records reflect that in April 2009, the principal balance due was $12,052,490.99.

*Compare* Ex. 42 (Sovereign Bank monthly statement) with Ex. 66, 4th Walnut's

accounting.  Thereafter, the loan went into default, yet Sovereign neither compounded

interest nor charged interest at the default rate.  On May 26 and August 4, 2009, the

Debtor made two payments of $75,866 to Sovereign, which Sovereign applied

consistent with its amortization schedule.  *See* Ex. 43, 46 (monthly statements for June

and September 2009); *see also* Ex. 69 Scherf Dep. 83-84.[12]  The Court's ruling, *supra*,

allows 4th Walnut to compound interest only as of the date it purchased the loan (June

18, 2010) and until the petition date (July 23, 2010).  That makes 35 days of interest

which 4th Walnut may compound.  At the contract rate of 5%, this yields $57,591.43.[13]

Adding that amount of interest to the principal balance of April 2009 ($12.052,490.99)

less principal payments made ($40,563.47) results in a total prepetition outstanding

balance of $12,069,518.95:

| | |
|---|---|
| Principal as of April 2009 | $12,052,490.99 |
| Less Payments Applied to Principal | ($    40,563.47) |
| Principal Debt as of 6/18/10 | $12,011,927.52 |
| Compound Interest 6/18/10 to 7/23/10 | $     57,591.43 |
| Prepetition Principal Balance | $12,069,518.95 |

*Interest*

---

[12]The May 26 payment was allocated $20,239.57 to principal, $50,218.71 to interest and
$5,407.72 to taxes.  Similarly, the August 4 payment was allocated $20,323.90 to principal,
$50,134,38 to interest and $5,407.72 to tax escrow.

[13]$12,011,927.52 x 0.05 x (35 days/365 days) = $57,591.43

The second line item of 4th Walnut's claim is for interest in the amount of $1,344,050.76. Before the Court can determine the extent to which interest is to be allowed, an understanding of what it represents is required. The 4th Walnut claim breaks interest down into two general components: interest prior to acceleration and interest after acceleration. The interest which accrued prior to acceleration was compounded and so it is already part of the principal; therefore, it does not appear as a separate line item in the claim. Interest accruing after acceleration is calculated on a simple basis; that is what the $1,344,050.76 represents. *See* Ex. 66. For the reasons which follow the interest component will be reduced.

The first adjustment will be to the interest rate. The applicable rate will be the contract rate of 5%. The second adjustment affects how the unpaid interest accrues. The claim will accrue interest consistent with the loan's amortization schedule. This accrual will occur until the date Sovereign sold the loan (June 18, 2010). Thereafter, and until the bankruptcy filing (July 23, 2010), interest has already been compounded into principal as discussed above. Thus, the downward adjustments to the 4th Walnut claim for interest consist of a reduced rate of interest and a substantially shortened period of compounding.

Adjusting the claim accordingly, the Court calculates accrued interest in the total amount of $ 624,484.40. The Court has reached its figure by beginning from the month in which the loan went irretrievably into default: March 2009. *See* Ex. 40. Over the next 16 months (that is, through July 1, 2010) unpaid interest grew to $644,950.34. *See* Ex.

41-55.[14]   This amount will be reduced by the interest accruing from the date Sovereign

sold the loan and until July 1, 2010, ($20,465.94)[15] because it is already included (i.e.,

compounded) into principal.

| Past Due Interest    7/1/10 | $644,950.34 |
|---|---|
| Less 6/18 to 7/1 Compounded | ($20,465.94) |
| Past Due Interest as of 6/18/10 | $624,484.40 |

*Late Charges*

        4th Walnut's claim includes late charges of $714,394.71.  With regard to late

charges, the note provides;

> **7.Late Charges**.  If any monthly installment due hereunder is not
> received by Lender on or before the 10th day of each month *or if any
> other amount payable* under this Note or under the Security
> Instrument or any other Loan Document is not received by Lender
> within 10 days after the date such amount is due, counting from and
> including the date such amount is due, Borrower shall pay to Lender
> immediately and without demand by Lender, a late charge equal to
> 5 percent of such monthly installment or other amount due.
> Borrower acknowledges that its failure to make timely payments will
> cause Lender to incur additional expenses in serving and
> processing the loan evidenced by the Note (the Loan), and that it is
> extremely difficult and impractical to determine those additional
> expenses. Borrower agrees that the late charge payable pursuant to
> this Paragraph represents a fair and reasonable estimate, taking
> into account all circumstances existing on the date of the Note, of
> the additional expenses Lender will incur by reason of such late
> payment.  The late charge is payable in addition to, and not in lieu
> of, any interest payable at the Default Rate pursuant to Paragraph
> 8.

Note, ¶ 7 [emphasis added].  The late charges assessed consist of late charges

_____

[14]The statement for June 2010 is not part of the record.  The Debtor explained that it
was unable to locate it.

[15]The 2010 statement showed current interest due of $48,803.39.  Of that amount, 18
days of interest (June 1 through June 18) would accrue as simple interest.  The 13 remaining
days of interest accrual for the month are compounded into principal.

assessed prior to acceleration plus one late charge calculated on the total accelerated

balance:

| | |
|---|---|
| Late Charges Prior to Acceleration | $ 49,458.05 |
| Prepayment Penalty | $ 130,655.03 |
| Principal | $13,118,620.06 |
| Subtotal: | $13,298,733.15 |
| 5% Late Charge on Subtotal | $ 664,936.66 |
| Total Late Charges | $ 714,394.71 |

*See* Ex. 66 4th Walnut Accrued Balance Calc.; *see also* 4th Walnut's Br. 19.

As to these late charges, the Debtor raises both general and specific objections.

The general arguments against late charges are two-fold: first, the Debtor argues that, in

allowing late charges, most Court's hold that the assessment of such a charge would be

unreasonable when coupled with default interest.  Debtor's Br. 41.  That argument is

moot as a result of the Court's holding that default rate interest will not be allowed.  The

second argument against late charges relies, yet again, on a theory of waiver.  Debtor's

expert witness, Scherf, testified that while late charges were periodically reported on the

Debtor's account statement, such charges were ultimately waived by Sovereign.  Ex. 6,

Scherf Expert Rep.  6.  As evidence of that fact, the Debtor relies on the annual loan

statement for 2010 and an account summary statement that was produced in discovery.

Ex. 59-60.

A close review of the annual statements and the loan summary belie this. On the

annual statement for 2010 and the loan summary, the next to last line item is a

deduction of $76,011.50.  It appears under the column heading "Late Charges."  To the

Debtor, this deduction is evidence of a waiver of those late charges.  To the Court, it

17

represents something else.  The date of the deduction is June 30, 2010.  *See* Ex. 59

and 60.  That is 12 days *after* the loan was sold.  By that date, Sovereign could not have

waived the late charges because it no longer owned the loan. What the June 30 entries

on the statement and summary appear to be, then, are book-keeping entries zeroing out

the loan and all related charges after the sale to 4th Walnut.  Indeed, the very next—and,

for that matter, last— bookkeeping entry on both the statement and summary is

designated "loan payoff" and is in the principal amount of the loan.  This, then, is not a

waiver of the late charges.  It is an accounting entry to reflect that a non-performing loan

was sold and that the asset was henceforth off the bank's books.

Corroborating this conclusion are other documents.  The monthly account

statements reflect late charges up to the week before bankruptcy.  Likewise, the

November 2009 demand letter expressly includes late charges.  *All* of the evidence

demonstrates that Sovereign did not waive its right to late charges.  For that reason, the

late charges assessed prior to acceleration in the amount of $49,458.05 will be allowed.

*Late Charges After Acceleration*

Where the Debtor's position is much stronger is as to the single late charge of

$664,936.66.  That charge constitutes 5% of the total accelerated balance of

$13,298,733.15.  The Debtor argues that Sovereign Bank never charged a late fee on

the total loan balance.  *See* Ex. 69, Scherf Dep. 74:13.  4th Walnut once again argues

simply that a late charge on the accelerated loan amount is permitted under the note.

4th Walnut's Reply Br. 19.

The Third Circuit has ruled that a mortgagee cannot impose late charges after

accelerating a loan balance, at least in the absence of a specific provision in the

18

mortgage. *See Security Mutual Life Ins. Co. of New York v. Contemporary Real Estate Associates*, 979 F.2d 329, 331 (3rd Cir. 1992). There, the Third Circuit reasoned that acceleration obligates the mortgagor to pay the entire debt, and therefore eliminates the requirement of monthly installments. *Id.* The late charges provision in this note is not specific as to any item payable other than each monthly installment. It also includes as subject to a late charge "any other amount payable." Theoretically, an accelerated balance could constitute an "other amount payable." But certainly one should not have to guess. The language, at best, is vague. But even assuming it is sufficiently specific, the charge is still subject to a test for reasonableness. *See In re Graboyes*, 371 B.R. 113, 123 n.14 (Bankr.E.D.Pa. 2007) 4th Walnut offered no evidence on this point.

To be reasonable, the charge must relate rationally to the purpose which it is intended to serve. *Id.* The provision for late charges in the note itself recites that it is intended to compensate for the time and expense incurred in administering late loan payments. *See* Ex. 7, Note ¶ 7. That makes sense: when a payment is late, it cannot be applied in the exact amounts that the amortization schedule allocates for principal and interest. More of that payment must go to pay interest and less to principal. *See In re Tolbert*, 2011 WL 3734240, at *1 (Bankr.M.D.Ga. Aug. 23, 2011). *See also Northwestern Mut. Life Ins. Co. v. Uniondale Realty Associates*, 11 Misc. 3d 980, 986, 816 N.Y.S.2d 831, 836 (N.Y.Sup.2006) ("Indeed, amortization schedules outline precise interest payments due over the life of the loan.") The later a payment is, a progressively higher amount of the payment pays off the accrued interest and progressively less goes to amortize the principal balance. *Id.* For a lender in privity with a chronic late-paying borrower, the resources devoted to reconciling the actual payments with the amortization

19

schedule can be significant.  Under those circumstances, a late fee charged to each late payment seems fair.

Yet, while even a single late payment effectively creates a new amortization schedule, (*see Tolbert, supra. id*), the Court is hard pressed to understand how a single late payment —even one in the amount of roughly $13 million—would cause a lender to incur related incidental expenses of nearly $665,000.  This appears to be just another blatant attempt at overreaching on the part of the claimant.  Accordingly, the late charge of $664,936.66, constituting 5% of the unpaid balance will be disallowed.  As noted, the claim may, however, include limited late charges in the amount of $49,458.05.

*Prepayment Premium*

The last component of the claim which the Debtor challenges is the prepayment premium.  On the claim itself, that charge is listed in the amount of $8,061.20.  The original amount was much larger ($130,655.03) but against it 4th Walnut applied certain prepetition payments of $122,593.83:

| Accelerated Loan Balance | $13,065,503.05 |
|---|---|
| Prepayment Premium (1%) | $    130,655.03 |
| Payments Applied | $  (122,593.83) |
| Net Prepayment Premium | $      8,061.20 |

*See* Ex. 66 (column 11, Prepayment Penalty).

The Debtor argues that the lender may not collect a prepayment premium on an amount already paid.  It argues that the premium compensates the lender for the interest which will not be repaid where the loan is accelerated.  *See* Debtor's Brief 49-51; *see also* Ex. 69 Scherf Dep. 88-91; Ex. 6 Scherf Expert Rep.7.  4th Walnut's response is

that the note entitles it to collect a prepayment premium notwithstanding acceleration.

4th Walnut's Reply Br. 20.

4th Walnut is correct that the note provides for a prepayment penalty even in the

event of acceleration:

> Upon Lender's exercise of any right of acceleration under this
> Note, Borrower shall pay to Lender, in addition to the entire
> unpaid principal balance of this Note outstanding at the time
> of the acceleration, (A) all accrued interest and all other sums
> due Lender under this Note and the other Loan Documents,
> and (B) *the prepayment premium calculated pursuant to
> Schedule A.*

Ex. 7, Note, ¶ 10(a)(2) (emphasis added).  Schedule A to the note provides for a 1%

premium for prepayment which occurs in years 5 through 7 of the loan term.  *Id*.,

Schedule A.   This loan originated in February 2004, defaulted in April 2009, and was

accelerated in November 2009.  Acceleration occurred within the 5th through 7th years of

the loan.  Thus, to the extent that a prepayment premium will be allowed, it will be

calculated at the 1% rate.

As a general proposition, a lender may not collect a prepayment premium after

accelerating a loan balance.  The two related rationales for this are that the lender's

acceleration precludes a voluntary decision to prepay and that a borrower cannot *pre*pay

that which is already due as a result of acceleration.  *See, e.g., In re Planvest Equity

Income Partners IV*, 94 B.R. 644, 645 (Bankr.D.Ariz.1988); *Slevin Container Corp. v.

Provident Fed. Sav.,* 98 Ill.App.3d 646, 648, 424 N.E.2d 939, 940–941 (Ill. App. 1981)*;

In re McMurray*, 218 B.R. 867, 874 (Bankr.E.D.Tenn. 1998); *McCarthy v. Louisiana

Timeshare Venture* (La.App. 4th Cir.1982) 426 So.2d 1342, 1346; *American Fed. Sav. v.

Mid–America Service,* 329 N.W.2d 124, 125–126 (S.D.1983); *Matter of LHD Realty*

*Corp.,* 726 F.2d 327, 330–331 (7th Cir.1984).  But where there exists an express

provision for a prepayment premium notwithstanding acceleration, allowance of the

premium has been upheld.  *See, e.g.,First Nat. Bank of Maryland v. PNB,* 1989 WL

79789, at *8 (E.D.Pa. July 10, 1989)*; Eyde v. Empire of America Federal Sav. Bank*, 701

F.Supp. 126, 129 (E.D.Mich. 1988);  *In re Schaumburg Hotel Owner Ltd. Partnership,* 97

B.R. 943, 954 (Bankr.N.D.Ill.1989); *Westmark Commercial Mortgage Fund IV v.*

*Teenform Associates, L.P.*, 362 N.J. Super. 336, 347, 827 A.2d 1154, 1161 (Pa.Super.

2003); *MONY Life Insurance Company v. Paramus Parkway Building, Ltd.*, 364 N.J.

Super. 92, 105, 834 A.2d 475, 483 (N.J.Super 2003); *CP Holdings, Inc. v. CALPERS*,

332 B.R. 380, 382 (W.D.Mo. 2005); *AE Hotel Venture*, 321 B.R. 209, 218 (Bankr.N.D.Ill.

2005); *In re Premier Entertainment Biloxi LLC*, 445 B.R. 582, 627

(Bankr.S.D.Miss.2010); and *In re South Side House, LLC* 451 B.R.248, 269

(Bankr.E.D.N.Y. 2011) .

Pennsylvania courts have held that a prepayment premium constitutes a

liquidated damages provision.  *See Citicorp Mortgage, Inc. v. Morrisville Hampton*

*Village Realty, L.P.*, 662 A.2d 1120, 1122, 443 Pa.Super. 595, 599-600

(Pa.Super.1995).  Under Pennsylvania law, a liquidated damages provision is

enforceable only to the extent that it is reasonable*.  Finkle v. Gulf & Western Mfg. Co*.,

744 F.2d 1015, 1021 (3d Cir. 1984); *Perry v. H & R Bock Eastern Enterprises, Inc*., 2009

WL 2581708, at *3 (E.D.Pa. Aug. 18, 2009).  Where the provision is incommensurate

with the amount of loss, it will be considered a penalty and will not be enforced.  *Id*.

4th Walnut, once again, offered no evidence on the point.

Determining if a charge is reasonable requires understanding its purpose.

22

Debtor's expert witness, Scherf, explained that the premium is to make up for the

lender's lost profit on the difference between the interest it earns on loans such as the

one made in this instance, and the interest paid to its depositors (the "spread").  *See*

Debtor's Br. 50 citing Scherf Dep. 89-91.  A recent bankruptcy case from this Circuit

explains the purpose behind this type of charge:

> The purpose of a prepayment premium is [to] ensure that the
> lender obtains the benefit of the bargain by protecting it
> against falling interest rates.  A prepayment premium is a
> type of "charge" and, thus, must be "reasonable." The
> reasonableness of a prepayment penalty is determined by
> how accurately it predicts actual losses that will be incurred
> by the creditor if the obligation is paid before the end of the
> term.  It is the creditor's burden to demonstrate that the
> prepayment premium is reasonable.

*Atrium View, LLC v. Eastern Savings Bank, FSB (In re Atrium View, LLC*), 2008 WL

5378293, at ** 2-3 (Bkrtcy.M.D.Pa., Dec. 24, 2008) (citations omitted)

A reasonable prepayment premium, the *Atrium* court went on, must approximate

actual damages:

> A prepayment charge formula must effectively estimate
> actual damages, otherwise, the charges may operate as
> either a penalty on the debtor or a windfall to a lender, at the
> expense of other creditors of the bankruptcy estate. Only a
> prepayment charge formula which [sic] reasonably measures
> actual damages will be respected under 506(b).

*Id. quoting In re Duralite Truck Body & Container Corp.*, 153 B.R. 708, 714 (Bankr.D.Md.

1993).

The means of determining actual damages is not complicated:

> The damage formula is simple and well established. It is the
> difference in the interest yield between the contract rate and
> the market rate at the time of prepayment, projected over the
> term of the loan and then discounted to arrive at present
> value.  Any prepayment charge should be wholly or largely

dependent upon such a calculation.

*Id. quoting A.J. Lane and Co., Inc.* 113 B.R. 821, 829 (Bankr.D.Mass.1900).  "If a provision makes no attempt to approximate actual damages, the provision is unreasonable." *Id. citing In re Schwegmann Giant Super Markets*, 287 B.R. 649, 656–57 (E.D.La.2002).

In this case, 4th Walnut has offered <u>no</u> evidence in support of its claim that it has suffered a loss on the order of $130,000 as a result of the Debtor's default.  This is not surprising given the testimony of its lone witness, Chief Investment Officer David G. Archibald.  He testified, in detail, as to the <u>profit</u> that 4th Walnut expects to make from this investment.  Under the various scenarios outlined by him, profit was not a question of "if," but of "how much."  Trial Tr. 120-124.  Given that testimony, the Court finds no basis to award a prepayment premium.  That part of 4th Walnut's claim will accordingly be disallowed and the prepetition payments applied against it will be offset against late charges and interest.

*Conclusion*

The Proof of Claim 7-3 of 4th Walnut will be allowed in the amount of $12,620,867.57.  The Summary of Holding at the beginning of this Opinion itemizes the three components of the allowed claim.

An appropriate order follows.

By the Court:

Dated: <u>October 20, 2011</u>
_____
Stephen Raslavich
Chief U.S. Bankruptcy Judge