IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: | : CHAPTER 11 |
| | : |
| 400 WALNUT ASSOCIATES, L.P., | : |
| | : BANKRUPTCY NO. 10-16094 |
| DEBTOR. | : |
| | : |
| | : |
| 400 WALNUT ASSOCIATES, L.P., | : |
| | : |
| PLAINTIFF | : |
| vs. | : |
| | : |
| 4TH WALNUT ASSOCIATES, L.P., | : |
| IVY REALTY LLI, LLC., AND | : ADV. NO. 10-456 (SR) |
| IVY REALTY SERVICES, LLC., | : |
| | : |
| DEFENDANTS. | : |
| | : |

# OPINION

BY: STEPHEN RASLAVICH, CHIEF UNITED STATES BANKRUPTCY JUDGE.

## Introduction

Before the Court is a particularly troubling matter.  The issue is the sanctions to be imposed against Sovereign Bank ("Sovereign") for its failure to fully comply with certain subpoenas *duces tecum* (the "Subpoenas *Duces Tecum*") which were served upon it by the Debtor, 400 Walnut Associates, L.P. ("Debtor").  This matter was raised by motion, namely the Motion of Debtor for an Order Compelling Sovereign Bank to Comply with Subpoenas *Duces Tecum* dated August 23, 2010 and July 12, 2011, to Produce Documents and to Impose Sanctions (the "Motion").  *Adversary Proceeding,*[1] *Docket Entry No. 50.*  For the reasons set forth in detail below, the Motion will be

---

[1]  Any reference to "Adversary Proceeding" shall mean the instant proceeding.

granted.[2]  Monetary and non-monetary sanctions shall be imposed against Sovereign

for  abuse of the discovery process.  As for the non-monetary sanction,[3] Sovereign shall

be required to produce to the Debtor the documents which it submitted to the Court for

an *in camera* review.  Under the circumstances presented no lesser sanction would be

adequate, because Sovereign's misconduct in this matter constitutes one of the most

serious incidents of discovery abuse the Court has witnessed.

**Background.**

**A.  The Debtor, the Property, the Loan and the Default**

The Debtor is a Pennsylvania limited partnership which owns the real property

(the "Property") located at 400-414 Walnut Street in Philadelphia, Pennsylvania.

*Schedule A, Bankruptcy Case,[4] Docket Entry No. 52;* see *also Certification of John*

*Turchi in Support of First Day Motions , dated July 23, 2010 ("Turchi Certification"), at*

*¶ 3, Bankruptcy Case, Docket Entry No. 8.*  The Debtor purchased the Property, which

was originally an office building, in May of 2000.  *Amended Disclosure Statement with*

*Respect to Plan of Reorganization Proposed by 400 W alnut Associates, L.P., a*

*Pennsylvania Limited Partnership Debtor in Possession ("Disclosure Statement") ¶ 1.2,*

*Bankruptcy Case, Docket Entry No. 252.*  The Debtor converted the Property into 67

---

[2]  Sovereign included a cross-motion for a protective order and a cross-motion
for an *in camera* review in its response to the Debtor's Motion.  *See Adversary
Proceeding, Docket Entry No. 59.*  The Court conducted an *in camera* review for the
purpose of ruling on the Motion.  The cross-motion for a protective order is denied
based on the reasons set forth in this decision.

[3]  The Court shall impose a monetary sanction against Sovereign after an
evidentiary hearing is held on that issue.

[4]  Any reference to "Bankruptcy Case" shall mean the Debtor's bankruptcy case,
Case No. 10-16094.

luxury residential apartments and 1 commercial unit.  *Transcript, dated 12/9/2010 ("Tr.*

*12/9/10"), at 23, Bankruptcy Case, Docket Entry No. 155; Disclosure Statement ¶ 1.1.*

Pursuant to a Lease Agreement, dated May 29, 2002, as amended, the Debtor leased

the Property to 400 Walnut Greentree Associates, L.P. ("Greentree"), which, in turn,

subleased the apartments to third party tenants.  *Turchi Certification ¶¶ 11(b) & 12.*

The Debtor borrowed a construction loan of approximately $12 million from

Amalgamated Bank to finance the construction of the apartment units.  *Tr. 12/9/10 at*

*24*.  In February of 2004, after the construction was complete, the Debtor refinanced the

construction loan with a new loan from Independence Community Bank for $13.125

million. *Id. at 24-25; Disclosure Statement ¶ 1.2.*  The new loan (the "Loan") was

evidenced by a Multifamily Note and was secured by, *inter alia*, a mortgage and

assignment of rents.  *Id.*

In 2006, Sovereign acquired Independence Community Bank and became the

successor in interest to the Multifamily Note and the related Loan documents.  *Id.*

Debtor successfully made payments under the Multifamily Note until June of 2009 when

its deteriorating financial position rendered it unable to do so.  *Id.*  The following

November, Sovereign declared a default under the Loan documents.  *Id*.  Sovereign

subsequently notified the Debtor's subtenants in writing of the default and demanded

that the subtenants make their rental payments to Sovereign.[5] *In re Walnut Associates,*

*L.P., 454 B.R. 601, 604 (Bankr. E.D. Pa. 2011); Response of Sovereign Bank to*

*Debtor's Motion for Order Compelling Compliance with Subpoenas Duces Tecum and*

---

[5]  The occupants of the apartment units in the Property were subtenants of the
Debtor since Greentree was the tenant pursuant to the Master Lease Agreement.

*for Sanctions and Cross-Motion for Protective Order and In Camera Review*

*("Sovereign's Response") at 2, Adversary Proceeding, Docket Entry No. 59.*

**B.      The Mortgage Foreclosure Action,
         the alleged Forbearance Agreement
         <u>and the Subsequent Purchase of the Loan</u>**

On or about January 29, 2010, Sovereign commenced a Mortgage Foreclosure

action ("the Mortgage Foreclosure Action") against the Debtor by filing a complaint in

the Philadelphia Court of Common Pleas.  *Disclosure Statement at ¶ 1.2; Sovereign's*

*Response at 2.*  The commencement of this action prompted a meeting between the

Debtor and Sovereign on the very same day.  *In re Walnut Associates, L.P., 454 B.R. at*

*609.*  According to the Debtor, the meeting resulted in a forbearance agreement

("Forbearance Agreement") which Sovereign's counsel was to put into writing.  *See*

*Debtor's Complaint and Objection to Proof of Claim No. 7 As Amended ("Complaint")*

*¶ 25, Adversary Proceeding, Docket Entry No. 1.*  Following the meeting between

Sovereign and the Debtor on January 29, 2010, Sovereign took no further action to

proceed with its prosecution of the Mortgage Foreclosure Action.  *In re Walnut*

*Associates, L.P., 454 B.R. at 612.*

As will be explained below, whether the Forbearance Agreement existed and

whether there is sufficient documentation of it to satisfy the Statute of Frauds have

been and, following the issuance of this decision, may continue to be <u>pivotal</u> issues in

this proceeding.  Had Sovereign properly complied with the Subpoenas *Duces Tecum*,

the course which this adversary proceeding has taken may potentially have been

entirely different.

As alleged by the Debtor, one of the terms included in the Forbearance

4

Agreement was that the rents would go back to the Debtor, who would use them to pay

the expenses associated with the Property and then remit the remainder of it to

Sovereign. *Id. at 609.* On January 29, 2010, which is the day upon which the

Forbearance Agreement was purportedly made, letters were hand-delivered to the

Debtor's subtenants instructing them to resume making their monthly rent payments to

Greentree, which would remit them to the Debtor. *Id*. The letters were signed by

Sovereign's counsel and a representative of Greentree. *See Exhibit "B" to Complaint* .

The letters had their intended effect of causing the subtenants to resume paying their

rent to Greentree. *In re Walnut Associates, L.P., 454 B.R. at 609.* The Debtor, in turn,

used the rents to pay monthly expenses for the Property and remitted the remainder of

the rents to Sovereign. *Id.*

According to the Debtor, it commenced operating in reliance on the Forbearance

Agreement on January 29, 2010. *Complaint ¶ 29.* The Debtor alleges that Sovereign

intermittently provided it with status reports regarding Sovereign's preparation of the

draft Forbearance Agreement and its review of the same. *Id. ¶¶ 30-33.*

However, on or about May 18, 2010, Ivy Realty submitted a letter of intent to

Brian Fiumara at the Flynn Company, which was an offer to purchase the Loan

collateralized by the Property for the amount of $9,550,000 (the "Letter of Intent").

*Complaint ¶ 37; Answer and Affirmative Defenses of 4th Walnut Associates, LLP, Realty*

*LII, LLC and Ivy Realty Services, LLC to Counts VII and VIII of Complaint ("Answer")*

*¶ 37,[6] Adversary Proceeding, Docket Entry No. 15.* The Letter of Intent identified the

---

[6] Citations to the same paragraph in the Complaint and Answer mean that the
factual allegation in the Complaint was admitted in the Answer.

purchaser of the Loan as a joint venture between affiliates of Ivy Realty and ABCO

Properties. *Complaint ¶ 38; Answer ¶ 38.* On May 24, 2010, the Letter of Intent was

accepted by a workout officer at Sovereign. *Complaint ¶ 39; Answer ¶ 39.* On June 30,

2010, defendant 4th Walnut Associates, L.P.  ("4th Walnut") purchased the Loan from

Sovereign. *See Complaint ¶ 5; Answer ¶ 5.*

## C.   4th Walnut and Debtor's Bankruptcy Case

By letter dated June 30, 2010, Sovereign informed the Debtor that it had sold the

Loan to 4th Walnut. *Disclosure Statement at pg. 4; Exhibit "K" to the Complaint (Copy of*

*Letter, dated June 30, 2010 from Craig to the Debtor).* Thereafter, 4th Walnut advised

the Debtor in writing that: (i) 4th Walnut was the new owner of the Loan; (ii) the Debtor

had previously been advised that the Loan was in default; (iii) the Loan documents

provided no opportunity to cure the payment defaults; and (iv) all obligations under the

Loan had been accelerated and were immediately due. *Disclosure Statement at pg. 4;*

*Exhibit "L" to the Complaint (copy of Letter, dated July 2, 2010 from 4th Walnut's*

*counsel to the Debtor).*

On July 23, 2010, Sovereign, which had taken no action in the Mortgage

Foreclosure Action since its meeting with the Debtor on January 29, 2010, filed a

Praecipe to Settle, Discontinue and End the litigation. *See Sovereign Bank v. 400*

*Walnut Associates, Philadelphia Court of Common Pleas, Case No. 100103364, Civil*

*Docket Report, Docket Entry July 23, 2010.* On the same day, the Debtor filed a

Voluntary Petition for Relief under Chapter 11 of the Bankruptcy Code. *Bankruptcy*

*Case, Docket Entry No. 1.*

**D.      4th Walnut's Motion for Relief from the Automatic Stay
and Debtor's Response to the Motion**

On August 6, 2010, which was approximately two weeks after the

commencement of the Debtor's bankruptcy case, 4th Walnut filed a motion for relief

("Motion for Relief") from the automatic stay, contending that Debtor was in default

under the Loan documents.  *See Motion of 4th Walnut Associates, L.P. for Relief from*

*the Automatic Stay Pursuant to 11 U.S.C. § 362(d), Bankruptcy Case, Docket Entry No.*

*34.*   On August 20, 2010, the Debtor filed its response to the Motion for Relief (the

"Response").  *See Response and Affirmative Defenses of the Debtor to the Motion for*

*Relief from the Automatic Stay, Bankruptcy Case, Docket Entry No. 49.* In its

Response, the Debtor specifically alleged that it was not in default under the Loan

documents because it had been operating in reliance on the Forbearance Agreement

which it reached with Sovereign on January 29, 2010, and had "affirmatively complied

with its payment obligations."[7] *Id. ¶¶ 8-9, 54-57, 59.*  Consequently, the existence the

Forbearance Agreement has been a central issue in the Debtor's bankruptcy case since

nearly the day it was filed.

**E.      The First Subpoena *Duces Tecum***

On August 26, 2010, the Debtor served a subpoena duces tecum on Sovereign

("First Sovereign Subpoena), seeking information and documents regarding the Loan

---

[7]  The Debtor also asserted in its Response that 4th Walnut was adequately
protected, that there was equity in the Property and that the Property was necessary to
the Debtor's reorganization.  *See Response and Affirmative Defenses of the Debtor to
the Motion for Relief from the Automatic Stay ¶¶ 43-29.*

7

and the Forbearance Agreement.[8] *See Bankruptcy Case, Docket Entry No. 69.* The

First Sovereign Subpoena commanded Sovereign to produce, *inter alia*, the following

documents:

> 1.    All documents that Sovereign delivered to 4th
>       Walnut in connection with the sale of the Loan
>       Documents to 4th Walnut.
>
>                           * * *
>
> 3.    All documents that relate to, are associated
>       with, or contain information relating or referring
>       to the Loan Documents.
>
>                           * * *
>
> 8.    All documents that relate to the agreement
>       reached between the Debtor and Sovereign in
>       January 2010.

*Exhibit A to Debtor's Motion.*    In response to the subpoena, Sovereign produced

approximately 218 pages of documents. *Debtor's Motion ¶ 10 & Sovereign's Response*

*¶ 10.*[9] Following its receipt of correspondence from the Debtor's attorney advising

Sovereign that it was not in compliance with the First Sovereign Subpoena because it

had not produced all documents requested therein, Sovereign subsequently produced

an additional 319 pages of documents. *Debtor's Motion ¶ 13 & Sovereign's Response*

*¶ 13.* Significantly, Sovereign did not produce a privilege log. Consequently, Debtor

had no notice that Sovereign was withholding any documents from production that were

responsive to the subpoena.

---

[8] The First Subpoena Duces Tecum is dated August 23, 2010. *See Exhibit "A" to Motion.*

[9] Citations to the same paragraph in the Motion and Sovereign's Response mean that the factual allegation in the Motion was admitted in the Response.

**F.**     **The Adversary Proceeding and the Defendants' Motion to Dismiss**

Debtor commenced the instant adversary proceeding by filing its Complaint against defendants, 4th Walnut, Ivy Realty LII, LLC and Ivy Realty Services, LLC. (collectively "the Defendants") on December 8, 2010.  *Adversary Proceeding, Docket Entry No. 1.*  The Debtor's contention that it reached an agreement with Sovereign on January 29, 2010 was integral to five of the eight counts of the Complaint, namely Counts I (Breach of Contract), Count II (Breach of Oral Contract), Count III (Breach of Duty of Good Faith/Fair Dealing), Count V (Declaratory Judgment, and Count VI (Intentional Interference with an Existing Contract).

On January 10, 2011, the Defendants filed a motion to dismiss Counts I through VII of the Complaint ("Motion to Dismiss").  *The Motion of the Defendants, Pursuant to Fed.R.Civ.P. 12, As Made Applicable by Fed.R.Bankr.P. 7012, to Dismiss Counts I through VII of the Debtor's Complaint, Adversary Proceeding, Docket Entry No. 4.*  On March 31, 2011, the Court issued an Order and Opinion granting the Motion to Dismiss except as to Count VII.[10] *400 Walnut Associates, L.P. v. 4th Walnut Associates, L.P. (In re 400 Walnut Associates, L.P.), 454 B.R. 60 (Bankr. E.D. Pa. 2011).*   In particular, the Court dismissed Counts I through VI of the Complaint because: (i) the documentation upon which the Debtor was relying to establish the Forbearance Agreement did not satisfy the Statute of Frauds; and (2) as alleged, the Forbearance Agreement was an unenforceable contract because it created no new obligations on the part of the Debtor.

---

[10]  The Court did not dismiss Count VII of the Complaint which alleges the tort of intentional interference with a prospective contractual relation because such claim was not premised on the existence of an enforceable contract. *400 Walnut Associates, L.P. v. 4th Walnut Associates, L.P. (In re 400 Walnut Associates, L.P.), 454 B.R. at 76–79.* To the contrary, the claim alleged that 4th Walnut wrongly interfered with a prospective forbearance agreement between the Debtor and Sovereign.  *Id.*

In its discussion of the Statute of Frauds, the Court noted that, while it was the Debtor's understanding from its January 29th meeting with Sovereign that its counsel was going to put the Forbearance Agreement in writing, "that apparently just never happened." *Id. at 69 (emphasis added)*.  The Court opined: "That does not mean, of course, that the Debtor's recollection is simply a fiction.  Indeed, matters may very well have unfolded exactly as the Debtor recalls." *Id.*  Nevertheless, without more documentary evidence than it had, the Debtor lacked sufficient writings regarding the Forbearance Agreement to satisfy the Statute of Frauds. *Id. at 67-70.*  In its Opinion, this Court described, in no uncertain terms, the significance of the Forbearance Agreement, not only to the instant adversary proceeding but also to the Debtor's bankruptcy case, stating:

> The importance of the alleged Forbearance Agreement to this proceeding, as well as to the recent ruling on cash collateral, cannot be overstated. The Debtor's claim that it reached an accord with Sovereign is the common thread which runs through five of the eight counts of its complaint. If the Debtor is unable to sufficiently allege the existence of an enforceable contract with Sovereign, all five counts must be dismissed. Put differently, the Court's finding on the question of whether an enforceable forbearance agreement has been stated will apply to all of the counts which are premised on it.

*Id. at 66-67.*  Had Sovereign complied with the First Sovereign Subpoena, Debtor would clearly have had significantly more documentary evidence of the existence and terms, of the Forbearance Agreement which may have enabled it to successfully oppose the Defendants' Motion to Dismiss.  Instead, the Debtor had its "hands tied behind its back" in responding to the Motion to Dismiss by Sovereign's failure to properly respond to the first subpoena.   As a corollary, the Court, of course, expended substantial time and energy deciding issues which, given the information and

documents which the Debtor now has and will have, may well have to be reconsidered with an entirely new decision issued.

### G.      The Second Subpoena *Duces Tecum*

In pursuit of evidence to support Count VII of its Complaint, the Debtor served another subpoena *duces tecum* on Sovereign on July 18, 2011 (the "Second Sovereign Subpoena").[11]  *See Adversary Proceeding, Docket Entry No. 27.*  The "Definitions and Instructions" in the document request which is attached to the Second Sovereign Subpoena state that "Sovereign Bank" includes its "employees, employers, agents, consultants, attorneys, successors and assigns, acting in any capacity, and all other persons or bodies acting or purporting to act on behalf of Sovereign."  *Exhibit "F" to Motion.*  The document requests themselves also specifically refer to Robert Craig ("Craig"), Edward Meditz ("Meditz") and Matthew Maiorino ("Maiorino"), all of whom worked at Sovereign.  Craig was the manager of the multi-family workout group (the Workout Group") which managed problem loans, including the Debtor's Loan. *See Exhibit "P" to the Debtor's Motion (Transcript, dated October 7, 2011, of Deposition of Robert Craig at 8-9).*  Meditz and Maiorino were workout officers whom Craig supervised in the Workout Group.  *Id. (Transcript at 15-16).*  Meditz was the workout officer who was originally assigned the Loan. *Id. (Transcript at 33).*  When Meditz was terminated by Sovereign in April of 2010, Maiorino replaced him and became responsible for managing the Loan.  *Id.*

In the document request which was attached to the Second Sovereign Subpoena, the Debtor commanded Sovereign to produce, *inter alia*, the following

---

[11]  The Second Sovereign Subpoena is dated July 12, 2011.  *See Exhibit "F" to the Motion.*

documents:

> 1.    Produce all documents evidencing, relating to
> or referencing communications between Craig,
> Maiorino, or Meditz and the Defendants and/or
> their counsel regarding the Property or any
> matter relating to the Property or the sale of
> the Loan Documents.

* * *

> 3.    Produce all documents evidencing, relating to
> or referencing communications between Craig,
> Maiorino, Meditz and The Flynn Company
> and/or its counsel regarding the Property or
> any matter relating to the Property or the sale
> of the Loan Documents.

> 4.    Produce all documents evidencing, relating to
> or referencing communications between Craig,
> Maiorino and/or Meditz regarding the Property
> or any matter relating to the Property or the
> sale of the Loan Documents.

> 5.    Produce all documents evidencing, relating to
> or referencing communications between Craig,
> Maiorino or Meditz and Brian Fiumara
> regarding the Property or any matter relating to
> the Property or the sale of the Loan
> Documents.

* * * *

> 7.    Produce all documents evidencing, relating to
> or referencing communications between
> Sovereign, Craig, Maiorino, or Meditz
> regarding the Property or any matter relating to
> the Property or the sale of the Loan
> Documents.

*Exhibit "F" to Debtor's Motion.*  In response to the Second Sovereign Subpoena,

Sovereign produced numerous additional documents to the Debtor.  However, it failed

to produce any drafts of the Forbearance Agreement.  Moreover, it failed yet again to

produce a privilege log.  The flagrancy of these failures is exacerbated by the fact that

several of the documents which Sovereign produced make specific reference to the

Forbearance Agreement and, in no uncertain terms, make it abundantly clear that a

draft of the agreement was prepared and that Sovereign was "about to execute" it.  In

one of the documents, namely an email, dated April 13, 2010, from Craig to another

employee at Sovereign, Craig stated:

> . . . <u>we are about to execute a forbearance agreement</u>
> whereby the Borrower has to increase rent roll to a
> "stabilized" level as defined by the current sub-market
> conditions for similar properties.  Can your people do some
> research of the sub-market to determine a current range of
> market occupancies?  As you will see, this property is in the
> historic "Society Hill" section of Philadelphia, but it obviously
> competes with newer product in Center City, also.  The
> numbers do not have to be precise, just sort of ball-park.

Exhibit "J" to Debtor's Motion (emphasis added).  In another document, which is an

email, dated April 22, 2010, from Maiorino to Brian Fiumara, a broker with The Flynn

Company, Maiorino advises Fiumara that "[t]he forbearance agreement has been

drafted, but has not been given to the borrower to sign." Exhibit "K" to Debtor's Motion.

In two more documents, namely Customer Review Reports, dated May 10, 2010 and

May 20, 2010, Maiorino, states:

> Prior to requesting bids on the note, <u>a forbearance
> agreement had been drafted</u>.  <u>The terms of the agreement,
> include</u> management increasing the rent roll by 12% within
> four (4) months; SOV is to receive a Deed-in-Lieu of
> Foreclosure in the event that borrower breaches the
> forbearance agreement; forbearance period would remain in
> effect until December 1, 2010 with the Bank holding the
> option to extend until March 1, 2011.  <u>Forbearance
> agreement is being held in abeyance while the note sale is
> being pursued.</u>

Exhibits "M" and "N" to Debtor's Motion (emphasis added).  These four documents

indisputably establish that a forbearance agreement existed at least in draft form.  The

documents also fit <u>squarely</u> within the document requests of the First Sovereign

Subpoena; yet, they were not produced until nearly one full year <u>after</u> the First

Sovereign Subpoena was served.

Furthermore, on October 7, 2011, the Debtor deposed Craig and discovered,

through his testimony, that the Workout Group which he supervised at Sovereign had

maintained a file on the Loan, the existence of which Sovereign failed to disclose and

which Sovereign failed to produce in response to the Subpoenas *Duces Tecum.  See*

*Exhibit "P" to Debtor's Motion (Deposition Transcript of Robert Craig at pgs. 10-11, 18).*

On October 10, 2011, the Debtor also deposed Maiorino who testified that he had <u>seen</u>

a draft of the Forbearance Agreement in the Workout Group's Loan file.  *See Exhibit "L"*

*to Debtor's Motion (Deposition Transcript of Matthew Maiorino at pgs. 18-21).*

Confronted with evidence that the Forbearance Agreement had been drafted and

that it had been or was contained in the Workout Group's file on the Loan, and despite

the fact that Sovereign had never provided a privilege log showing that it was

withholding any documents that were requested in the Subpoenas *Duces Tecum* on the

basis of privilege, Bertin Emmons, Esquire ("Emmons"), who is Sovereign's <u>Senior</u>

<u>Counsel and Vice President,</u> informed the Debtor's counsel, *via* a short two paragraph

email, dated October 11, 2011, that he had "researched this draft forbearance

agreement" and "discovered that Sovereign Bank is not required to produce it, as it is

privileged under both the attorney/client and work product privileges."  *Exhibit "Q" to*

*Debtor's Motion.*  Thus, more than a year after service of the First Sovereign Subpoena

14

and nearly three months after service of the Second Sovereign Subpoena, Sovereign

stated, for the first time, that it had additional documentation responsive to the Debtor's

discovery requests, but that it was not producing the draft Forbearance Agreement

because it was privileged.

**H.    The Debtor's Motion to Compel,
        Sovereign's Response to the Motion
        and the Hearings on the Motion**

Faced with Sovereign's blatant non-compliance with the Subpoenas *Duces*

*Tecum* which were served upon it, the Debtor filed its Motion on October 27, 2011.  *See*

*Adversary Proceeding, Docket Entry No. 50*.  A hearing on the Motion was scheduled

for November 10, 2011.  *See Adversary Proceeding, Docket Entry No. 52.*   On the

morning of the hearing, Sovereign filed its response to the Motion, requesting the Court

to deny the Debtor's Motion in its *entirety*.  *See Sovereign's Response at 13.*  In its

response, Sovereign also included cross-motions for a protective order and an *in*

*camera* review of the documents for which it is asserting the attorney-client privilege.

*Sovereign's Response at 13-15.*

While the best defense may often be a good offense, this would hardly have

seemed the time for such a strategy.  Even though Sovereign clearly failed to comply

with the Subpoenas *Duces Tecum* by producing all responsive non-privileged

documents and a privilege log identifying documents that, while responsive, were being

withheld from production, Sovereign's Response is replete with sarcastic and derisive

comments such as the following:

> And yet (despite the ruination of a forest), Debtor remains
> dissatisfied with the universe of documents produced by
> Sovereign.  *Sovereign's Response at 3.*

15

> Notwithstanding the immediate steps taken by Sovereign to respond, Debtor's counsel adamantly refused to delay [the] hearing on this Motion so that Sovereign could properly complete its review and production of additional documents (if there be any) responsive to the pleading. *Sovereign's Response at 3 n.3.*

> By Order dated March 31, 2011, this Court dismissed Counts I, II, III, IV, V and VI of the Complaint. The remaining cause of action alleges claims against the Buyer sounding in intentional interference with prospective contractual relations. It is this claim under which Debtor continues its "fishing expedition" to find some shred of evidence on which to draw Sovereign into the maelstrom. *Sovereign's Response at 3 n.1.*

> Debtor adds spice to its Motion by asserting that not only has Sovereign Bank obfuscated Debtor's many attempts to garner the "Forbearance Agreement", but that it "secretly withheld the belated[ly] revealed Forbearance Agreement . . ." Had the draft been typed in invisible ink, the Court would not be confronted with this issue. *Sovereign's Response at 12. n.6.*

> Debtor has repeatedly demanded that these "drafts" be produced as part of its year-long trolling expedition to find support for its argument that a forbearance agreement was breached by Sovereign Bank. *Sovereigns Response at 14.*

Again, while this sort of rhetoric may serve a purpose in some circumstances, its use by an entity which has been caught in red-handed violation of compulsory federal discovery rules seems surpassingly inappropriate. Rather than being persuasive, the rhetoric unfortunately suggests a curiously smug attitude by one clearly in the wrong.

At the hearing on the Motion on November 11, 2011, the Court questioned Sovereign's counsel about her client's disregard for its responsibility to fully respond to the Subpoenas *Duces Tecum*, stating:

> [W]hen you get a subpoena that says, I want all these documents, under what theory of law do you get to

16

produce some, then let the curtain fall, let some time
pass, then produce some more.  And the ones you
don't want to produce, you just don't produce.  You
don't file a motion for a protective order.  You don't
prepare a privilege log.  You don't say anything.  You
just don't produce them, and let it go at that.  What
theory of law justifies conduct like that?

*Transcript, November 11, 2011 ("November Tr."), at 10-11.*  Confronted with this

summary of her client's conduct, Sovereign's counsel belatedly conceded that

Sovereign "should have prepared a privilege log." *Id. at 11.*  After hearing from both

counsel, the Court ruled that Sovereign failed to comply with the subpoenas in the

following two respects: (i) it  failed to produce all non-privileged documents responsive

to the subpoenas; and (ii) it wholly and completely failed to prepare a privilege log or to

indicate in any way that it was not producing documents which were responsive to the

subpoenas but which the Bank was withholding from production based on its conclusion

that the documents were privileged.  *Id. at 9-11, 13-16.*  The Court ordered Sovereign

to comply with the subpoenas by producing a privilege log and providing to the Debtor

all documents not previously produced that were responsive to the subpoenas but not

listed on the privilege log. *Id. at 11-24.*  The Court also agreed to conduct an *in camera*

review of the privilege log and accompanying documents, but specifically advised the

parties that sanctions would be imposed against Sovereign based on its flagrant

misconduct  *Id. at 12.*  A subsequent hearing was then scheduled for Sovereign to

report on the status of its document production and preparation of its privilege log.

At the next hearing which was held on December 8, 2011, Sovereign reported

that it had prepared a privilege log, which it provided to the Court (*via hand-delivery* on

November 16, 2011), but that the privilege log would likely grow because Sovereign had

not yet completed its search for documents that were responsive to the subpoenas.

*Transcript, dated December 8, 2011 ("December Tr."), at* 11.  Sovereign also reported

that it was in the process of reviewing back-up tapes to ascertain whether the tapes

contained documents responsive to the subpoenas.  *Id. at 12-14.*[12]

The next hearing on the Motion was held on April 10, 2012.  Sovereign reported

that it had delivered the balance of the privileged documents along with a

comprehensive privilege log (the "Comprehensive Privilege Log") to the Court (*via*

*hand-delivery* on April 9, 2012). *Transcript, dated April 10, 2012 ("April Tr.") at 4.*

Sovereign also advised the Court that it had provided the Debtor and 4th Walnut with a

copy of the Comprehensive Privilege Log and copies of all non-privileged documents

responsive to the subpoenas.  *Id.*

The Court thereupon asked the Debtor and Sovereign whether there was

anything additional which they wanted to add to the record or do before the Court

rendered a decision with regard the Motion.  *Id. at 5-9.* The Debtor advised the Court

that, while it would want to present evidence at a hearing with regard to the monetary

aspects of Sovereign's failure to timely respond to the subpoenas, it had otherwise said

and done all that it wanted to in terms of the Motion.  *Id. at 5-8.*  As for Sovereign, it

---

[12]   At the December hearing, Sovereign requested the Court to narrow the time
period for which it was obligated to produce documents by setting June 30, 2010 as the
cut-off date instead of the date of production. *December Tr. at 15-16; 20-22.*  Following
a colloquy with counsel for the Debtor and Sovereign regarding the nature of the back-
up tapes and the number of tapes at issue, the Court granted Sovereign's request, in
part, by limiting the cut-off date for which Sovereign was required to produce secondary
source documents (*i.e.*, documents which the Bank possesses only on the back-up
tapes) to December 31, 2010. *Id. at 22-23.*  The Court kept intact the original cut-off
date, namely the date of production, for all primary source documents (*i.e.*, documents
actually in Sovereign's possession without the need to resort to the back-up tapes). *Id.*

requested the opportunity to provide additional oral argument on the Motion.  *Id. at 9.*

Sovereign thereupon presented a short oral argument, asserting that, despite the fact

that it had "produced thousands of more pages" in response to the Subpoenas *Duces*

*Tecum*, that did "not mean that the bank was not in compliance when it first produced

documents back in 2010 and 2011."  *See id. at 11-12.*  After Sovereign presented its

argument, it agreed that the record on the Motion, except as to monetary damages, was

complete and ready for disposition.  *Id. at 13-14.*  Based on these representations, the

Court advised the Debtor and Sovereign that it was taking the Motion under advisement

and would render a decision, except as to monetary damages, on the Motion.  *Id. at 14.*

## I.   The Comprehensive Privilege Log
and Accompanying Documents

Sovereign's Comprehensive Privilege Log, which was hand-delivered to the

Court on April 9, 2012, is 38 pages long.  In comparison, the privilege log which

Sovereign had delivered to the Court on November 16, 2010, was 17 pages long.[13]  The

documents which are listed on the Comprehensive Privilege Log fill three large binders

(collectively referred to as the "Binders")  One of the binders (the "First Binder") is 3

inches thick.  Sovereign delivered this binder to the Court with the original privilege log

in November.  The documents in the First Binder are bate-stamped SOV-000921 and

from SOV-001305 to SOV-001743.  The other two binders (the "Additional Binders") are

4½ inches thick.  In the Comprehensive Privilege Log, the bate-stamp numbers for the

documents in the First Binder were changed to SVB000015589 to SVB000016105.

The Comprehensive Privilege Log includes emails, letters and memoranda

---

[13]   The font used in the Comprehensive Privilege Log is substantially smaller
than the font used in the original privilege log.  Had the same size font been used in the
Comprehensive Privilege Log, it would be significantly longer than 38 pages.

between Sovereign and its counsel from the point in time that the firm was "retained to respond to the pending Motion to Compel (October 31, 2011 forward)." *See Letter, dated April 9, 2012, from Weir & Partners, LLP to the Court.* These documents were <u>not</u> included in the Binders. *Id.*

The documents in the Binders are not arranged chronologically, by category, or in any way which would enable a court to efficiently review them. Sovereign states, however, that, rather than include multiple copies of the same document in the Binders, it did its "best" to try to produce a document only once (even though the document might be listed multiple times on its privilege log) and for each time the document was identified, gave it a different bate-stamp number. While in the abstract Sovereign's efforts in this regard might be commendable, they are not, because Sovereign failed to cross-index the bate-stamp numbers for the documents, making a review of the Comprehensive Privilege Log and accompanying documents exceedingly tedious and cumbersome. For example, the document that was originally bate-stamped in the First Binder as SOV-001719 and then was renumbered on the Comprehensive Privilege Log as SVB00001594 is apparently the same document as SVB000011178, SVB000011231, SVB000011651 and SVB000011674.[14] However, SVB000011178, SVB00001123, SVB000011651 and SVB000011674 are <u>not</u> included in the Binders (which is only discoverable after searching for the document in a binder and finding it missing) and there is no cross-reference on the Comprehensive Privilege Log to the other identical documents or, even more importantly, to the bate-stamp number of the

---

[14]  While there are additional documents in the Binders that are the same as SOV-001719, the four documents referenced above will suffice for purposes of example.

copy of the document that _is_ included in the Binders.  Consequently, the privilege log

lists a document with its bate-stamp number(s) but the document might not be included

by that number in the Binders.  Because Sovereign failed to cross-index identical

documents, the only way to find the document is to search through the privilege log to

find the first time the document was listed by description and then look to see if the

document is located under that bate-stamp number in the relevant binder.

   In addition, the Comprehensive Privilege Log does not indicate whether the

unprivileged communications/information contained in documents that are listed on the

log were produced to the Debtor.  For example, the document that was originally bate-

stamped SOV-001605 is described on the Comprehensive Privilege Log as an "[e]mail

dated June 2, 2010 from Matt Maiorino and Bonnie Golub re: discussions of buyer's

counsel's request for documents, with email chain."  *See Comprehensive Privilege Log

at pg. 28 (emphasis added).* The email chain includes an email from David Archibald

("Archibald"), who is listed as the Chief Investment Officer at Ivy Equities, to Maiorino,

dated June 1, 2010.  While this non-privileged email from Archibald to Maiorino may

have been produced to the Debtor with the asserted privileged communication redacted

therefrom, there is nothing in the record which clarifies whether that was done.

   Other examples include the documents that were originally bate-stamped SOV-

001606 and SOV-001607 and are described on the Comprehensive Privilege Log as

"[e]mail dated June 3, 2010 from Matt Maiorino to Bonnie Golub re: meeting to discuss

buyer's counsel's request for documents, with email chain."  *See Comprehensive

Privilege Log at pg. 28 (emphasis added).*  This email chain contains an unprivileged

email from Archibald to Maiorino.  Again, nothing in the record reveals whether this

email was produced.  Likewise, the document which is bate-stamped #SVB000014669

is described as an "[e]mail from Bonnie Golub to Matt Maiorino dated 6/4/10."  *See*

*Comprehensive Privilege Log at pg. 14.*  The same document contains an email, dated

6/4/10, from Frank Correll ("Correll") at the law firm of Klehr Harrison Harvey Branzburg

LLP, which represents 4th Walnut, to Bonnie Golub.  The email states, in part:

> In follow-up to our call yesterday, I believe you and the bank
> said that the bank would be willing to send a letter to the
> borrower and the guarantor confirming that the loan is in
> default, that while a forbearance was discussed it was
> expressly conditioned upon senior management at the bank
> approving the same, that these approvals have not been
> obtained and that there is currently no forbearance
> agreement in place.  My client would like this letter sent out
> asap.
>
> We would also again ask that the bank send out the 237.1
> notice related to the foreclosure complaint.  While the
> borrower might just file Prelim Objections to the complaint, it
> would be useful to see if the borrower files an answer and
> any sort of defenses/counterclaims.  You said the bank was
> reluctant to take this step at this time.  I cannot understand
> why . . . [.]
>
> Please confirm the bank is going to send the letter and
> advise me if the bank will also send the 237.1 notice.

Comprehensive Privilege Log at pg. 14, document #SVB000014669.  Obviously, this

email is both highly relevant and responsive to the Subpoenas *Duces Tecum*.  It should

have been timely produced to the Debtor.

**J.   Emmons' Affidavit**

No witness testified on behalf of Sovereign in connection with this matter.

However, after the first hearing on the Motion, during which Sovereign's counsel

conceded that Sovereign should have provided a privilege log, Sovereign submitted

several affidavits to the Court, including a startling affidavit, dated November 16, 2011,

22

by Emmons, Sovereign's Senior Counsel and Vice President.  In the affidavit, Emmons

states that the "Bank receives in excess of 50-60 subpoenas [*duces tecum*] per day,"

and then astonishingly discloses that it is Sovereign's <u>standard</u> practice <u>not</u> to produce

a privilege log when it responds to a subpoena *duces tecum*.[15]  In the affidavit, Emmons

states, in

pertinent part:

> 3.   **The Bank has a group that is responsible
> for responding to court orders, including
> witness subpoenas and subpoenas *duces
> tecum*.**  I understand from speaking with
> people in that group (none of whom are
> lawyers), that it is the Bank's policy and
> practice to research its files, both manually and
> electronically in response to the service of
> subpoena *duces tecum* upon the Bank.

* * *

> 5.   **When the Bank responds to these
> subpoenas, it is not the Bank's practice to
> prepare privilege logs, or indexes of the
> documents that are produced**.

---

[15]  If Emmons' statement that Sovereign receives "in excess of 50-60" subpoena
*duces tecum* per day is intended to imply that the bank receives such an inordinate
number of subpoenas per day that it could not possibly comply with its legal obligations
the Court rejects any such notion.  According to Sovereign's own website, it has "[o]ver
14,000 branches," "[m]ore than 80 million customers in 40 countries," "$1.2 trillion in
deposits and customer funds under management," "[m]ore than 180,000 employees,"
and "3 million shareholders[.]" See http://www.sovereignbank.com/companyinfo/company
information/santander/default.asp[.] Assuming this information to be anywhere close to
accurate, it would certainly not seem surprising for the bank to receive 50 to 60
subpoenas *duces tecum* per day.  *Some* of the subpoenas *duces tecum* may involve
multi-million dollar transactions such as the one in the instant matter, and many of the
subpoenas may involve small matters where only a handful of documents are at issue.
But that is scarcely the issue.  Sovereign is not excused from complying with the law
because it receives a certain number of subpoenas *duces tecum* per day.  The rules of
discovery apply equally to each and every subpoena *duces tecum* with which
Sovereign, a multi-billion dollar financial institution, is served.

*Affidavit of Bertin C. Emmons, Esquire, dated November 16, 2011 (emphasis added).*

Notably absent from Emmons' affidavit is any statement by Sovereign that it intends to

amend its practice so that it will hereinafter comply with the legal obligations imposed

upon it when it receives subpoenas *duces tecum.*

## Discussion

Subpoenas in the federal courts are governed by Federal Rule of Civil

Procedure 45.[16]  When served with a subpoena, a non-party may protect itself, if

appropriate, by moving pursuant to Rule 45(c)(3) to have the subpoena modified or

quashed.  *See Fed. R. Civ. P. 45(c)(3).*   The non-party may also serve written

objections to producing documents requested in the subpoena. *Fed. R. Civ. P.*

*45(c)(2)(B).*  An objection "must be served before the earlier of the time specified for

compliance or 14 days after the subpoena is served." *Id.*  When a non-party withholds

documents or information that is sought in a subpoena on a claim of privilege, the party

is obligated under Rule 45(d)(2)(A) to expressly state the claim of privilege and support

it with "a description of the nature of the documents that is sufficient to enable the

demanding party to contest the claim." *Hays Run Associates v. Browning–Ferris, Inc.*,

1997 WL 476344, at *2 (E.D. Pa. August 18, 1997).  Rule 45(d)(2) states:

> (d) Duties in Responding to a Subpoena
>
> * * *
>
> (2) Claiming Privilege or Protection.
>
> (A) Information Withheld. A person
> withholding subpoenaed information under a

---

[16]   Rule 45 is made applicable hereto by Federal Rule of Bankruptcy Procedure
9016.

claim that it is privileged or subject to
protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld
documents, communications, or tangible
things in a manner that, without
revealing information itself privileged or
protected, will enable the parties to
assess the claim.

Fed. R. Civ. P. 45(d)(2)(A).  Failure to comply with Rule 45 " may constitute contempt."

*Hays Run Associates,* 1997 WL 476344, at *2.  Rule 45(e) provides, in pertinent part:

(e)    Contempt.  The issuing court may hold in
contempt a person who, having been served,
fails without adequate excuse to obey the
subpoena.

Fed. R. Civ. P. 45(e).  "'[T]he judicial power to hold a non-party" in contempt under Rule

45(e) is the "primary mechanism by which a court can enforce a subpoena.'" *Feltman v.*

*Granite State Insurance Company (In re Feltman), 2008 WL 630282, at *3 (Bankr. N.J.*

*March 5, 2008) (quoting Beruashvili v. Hobart Corp., 2006 WL 2289199, at *1 (E.D.*

*N.Y. August 8, 2006)).*  Whether to hold a nonparty in contempt under Rule 45(e) is

"within the discretion of the Court."  *Barnes Foundation v. Township of Lower Merion,*

*1997 WL 169442, at * 5 (E.D. Pa. April 7, 1997).*

In *Teleglobe USA Inc. V. BCE Inc. (In re Teleglobe Communications*

*Corporation)*, 493 F.3d 345 (3d Cir. 2007), the Third Circuit opined that "preventing a

party from asserting the attorney-client privilege is a legitimate sanction for abusing the

discovery process" if a court "finds bad faith, wilfulness, or fault."  *Id. at 386.*  Waiver of

the attorney-client privilege has also been imposed by other courts in similar

circumstances. *See In re Buchanan Ingersoll, P.C.*, 202 Fed. Appx. 454, 2006 WL

3039454 (Fed. Cir. Oct. 4, 2006) (rejecting contention of nonparties that the district court erred in ruling that they waived the attorney-client privilege by failing to timely object to subpoenas under Rule 45); *In re Clemente*, 17 Fed. Appx. 968, 2001 WL 1000706 (Fed. Cir. August 14, 2001) (rejecting argument that district court erred in its ruling that nonparty waived any claim for privilege based on its failure to timely prepare a privilege log in accordance with Rule 45); *cf. Smith v. James C. Hormel School, 2010 WL 3702528, at *5 (W.D. Va. Sept. 14, 2010)* (observing that in cases involving "unjustified delay, inexcusable conduct and bad faith," waiver may be imposed as a sanction when a party fails to timely assert its attorney-client privilege); *Get-a-Grip, II, Inc. v. Hornell Brewing Co., Inc., 2000 WL 1201385, at *3 (E.D. Pa. Aug. 8, 2000)* (ordering plaintiffs to produce all documents responsive to defendant's discovery requests, including the documents listed on the privilege log, on the grounds that the plaintiff waived the right to claim the attorney-client and/or work-product privilege by failing to timely assert it). Having rarely  seen a more egregious abuse of the discovery rules, this Court holds Sovereign in contempt under Rule 45(e) and shall impose both monetary and non-monetary sanctions upon it. The non-monetary sanction which shall be imposed against Sovereign is the following: Sovereign shall deemed to have waived the attorney-client privilege as to all documents in the Binders and shall be ordered to promptly produce such documents to the Debtor.[17]

---

[17]  Sovereign is not required to produce the emails, letters and memoranda between Sovereign and its counsel from the point in time that the firm was "retained to respond to the pending Motion to Compel (October 31, 2011 forward)." *Letter, dated April 9, 2012, from Weir & Partners, LLP to the Court.* As noted above, these documents were not included in the Binders.

***The Relevancy of the Documents and***
***Sovereign's Misconduct in the Instant Matter***

The Court conducted its *in camera* review of the documents which Sovereign

claims are privileged for the purpose of determining the relevancy of the documents to

the instant proceeding.  Had the *in camera* review revealed that the documents were

only tangentially relevant to this matter, then the Court might possibly consider

Sovereign's failure to promptly locate and produce the documents or advise the Debtor

that it was withholding them from production in a more lenient light.  For example, if the

documents simply made general references to the Loan or Loan documents without

any specific references to the meeting between Sovereign and the Debtor on January

29, 2010, the Forbearance Agreement, the drafting of the agreement, the status of the

agreement, Sovereign's negotiations to sell the Loan, *etc.*, it would be more

understandable why the documents at issue were not timely located because they may

have been created and filed somewhere years ago.  However, a cursory review of the

documents quickly dispelled that notion. The documents which Sovereign failed to

produce in response to the Subpoenas *Duces Tecum* are <u>directly</u> <u>relevant</u>, proverbial

"smoking-gun" type documents which were created within eighteen months or less from

the date upon which the Debtor served the Second Subpoena *Duces Tecum* on

Sovereign.  With minimal effort, Sovereign should have been able to locate the

documents in a timely manner and prepare a privilege log describing them. Sovereign's

failure to do so, under the circumstances herein, is unquestionably a wilful, wrongful

and flagrant violation of the discovery rules.

Had the Debtor not been as persistent as it was, the existence of the documents

at issue, in all likelihood, would have never been disclosed.  Indeed, even after

27

producing documents that specifically refer to the Forbearance Agreement and state that Sovereign was "about to execute" it, Sovereign still refused to acknowledge that the agreement had even been drafted.  It was only *after* the Debtor deposed Maiorino, who specifically testified that he had seen the draft Forbearance Agreement, that Sovereign's Senior Counsel and Vice President, Emmons, perfunctorily conceded that a draft of the agreement existed.  Of course, at the same time, he curtly advised the Debtor that Sovereign was withholding the draft on the basis of privilege.  Even at that, he failed to mention that Sovereign also possessed numerous additional documents that were responsive to the Subpoenas *Duces Tecum* that had not been produced.  It was only *after* the Debtor filed its Motion, requiring the Court to intervene in the dispute, that Sovereign *finally* commenced a proper search for documents responsive to the Subpoena *Duces Tecum*, and *finally* began preparing a privilege log.  By failing to conduct a reasonable search on a timely basis, Sovereign significantly and inexcusably obstructed the prosecution of this adversary proceeding as well as the Court's ability to efficiently and justly rule on issues presented.  As the Court noted above, it issued a decision, after expending numerous hours carefully combing the record and researching the issues, granting 4th Walnut's Motion to Dismiss based, in large part, on the Debtor's failure to satisfy the Statute of Frauds with regard to the Forbearance Agreement.  Had Sovereign properly responded to the First Sovereign Subpoena, the Court may possibly have reached a different conclusion.  Accordingly, Sovereign's misconduct has substantially harmed the Debtor and, but for the Debtor's persistence, would have deprived the Debtor of its ability to properly prosecute this matter.

### *Institutional Misconduct*

Sovereign's Senior Counsel and Vice President unabashedly states in his affidavit that "it is not the Bank's practice to prepare privilege logs" when responding to subpoenas *duces tecum*. Emmons Affidavit at ¶ 5. This statement, made by a senior executive at Sovereign, is alarming. Emmons' statement essentially means that every time Sovereign responds to a subpoena *duces tecum*, it is deciding, in its sole discretion, what to produce and what to withhold from production without alerting any party or court to the fact that it is doing so, thus preventing any oversight of its decision-making process. The implications of Emmons' disclosure are unnerving. One can only speculate as to the number of cases in which justice has been denied because of Sovereign's misconduct. Sovereign clearly must be motivated to amend its practice so that it complies with Rule 45(d)(2)(A) when it responds to subpoenas *duces tecum*.

### *Selection of Sanction*

In selecting the above described non-monetary sanction to impose against Sovereign, the Court has considered the prejudice which has occurred as a result of Sovereign's misconduct, the need to deter Sovereign from further violating Rule 45(d)(2)(A), Sovereign's sarcastic and dismissive written submissions, and Sovereign's apparent indifference to the Rules of Civil Procedure. Sovereign's blatant misconduct, its inexplicable proclamation that it routinely and as matter of course violates the rules of discovery in responding to subpoenas *duces tecum*, its disregard for whether justice is served and served in a timely manner, and its apparent indifference and/or lack of appreciation as to how its misconduct has impacted the Court, the Debtor, the Debtor's bankruptcy case, and the instant matter, demands no less of a sanction.

29

**Summary**

Based on Sovereign's abusive misconduct in the discovery process, the Motion shall be granted.  Non-monetary and monetary sanctions shall be awarded against Sovereign. Monetary sanctions shall be awarded based on such evidence as may be adduced at a subsequently scheduled hearing.  In the meantime, Sovereign shall be required to produce the documents contained in the Binders to the Debtor within five days.  Since the Court has conducted an *in camera* review of the Binders, Sovereign's cross-motion for an *in camera* review has been granted.  Its cross-motion for a protective order, however, shall be denied.

An appropriate Order follows.

By the Court:

_____
Stephen Raslavich
Chief U.S. Bankruptcy Judge

Dated: <u>July 11, 2012</u>