# IN THE UNITED STATES BANKRUPTCY
# COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE | : CHAPTER 11 |
| | : |
| 400 WALNUT ASSOCIATES, L.P. | : |
| | : |
| DEBTOR | : BANKRUPTCY NO. 10-16094 |
| ——————————————— | : |
| 400 WALNUT ASSOCIATES, L.P. | : |
| | : |
| AND | : |
| | : |
| JOHN TURCHI | : |
| PLAINTIFFS | : |
| vs. | : |
| | : |
| 4TH WALNUT ASSOCIATES L.P., ET AL | : ADV NO. 10-456 |
| DEFENDANT(S) | : |
| ——————————————— | : |

# OPINION

BY: STEPHEN RASLAVICH, UNITED STATES BANKRUPTCY JUDGE

*Introduction*

Before the Court are two separate Motions to Dismiss the Plaintiffs' Amended

Complaint. The first motion is filed by 4th Walnut Associates, L.P., Ivy Realty LII, LLC

and Ivy Realty Services, LLC (herein sometimes collectively referred to as "4th Walnut").

The second motion is filed by Sovereign Bank ("Bank"). Each movant seeks dismissal of

the specific counts directed against them. A hearing on the motions was held on

February 12, 2014 after which the Court took the matter under advisement. For the

reasons which follow, the Motions will be denied.[1]

---

[1] As this matter involves an objection to a claim, it is within this Court's core jurisdiction. *See* 28 U.S.C. § 157(b)(2)(B).

*Standard Required
for Stating a Claim*

The Motion is premised on F.R.C.P. 12(b)(6); to wit: that the Complaint fails to state a claim upon which relief can be granted.  In order to survive such a motion "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' "*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)(citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2008)); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir.2009) (explaining that pleading standards have seemingly shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss). The Supreme Court explained that although factual allegations are to be accepted as true for purposes of legal sufficiency, the same does not apply to legal conclusions; therefore, the factual allegations must sufficiently support the legal claims asserted. *Iqbal*, 556 U.S. at 679, 129 S.Ct. at 1949, 1950. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678, 129 S.Ct. at 1949 (citing *Twombly*, 550 U.S. at 555); *see also Fowler*, 578 F.3d at 210; and *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir.2008).

*Count I – Breach of Contract*

The first count is lodged against all of the defendants. Two challenges are raised as to it: first, that the claim is barred by the Statute of Frauds; and second, that the claim fails to allege the requisite elements of a contract claim.

*Statute of Frauds*

In Pennsylvania, the common law Statute of Frauds is codified at 33 P.S. § 1:

> From and after April 10, 1772, all leases, estates, interests of freehold or term of years, or any uncertain interest of, in, or out of any messuages, manors, lands, tenements or hereditaments, made or created by livery and seisin only, or by parol, and not put in writing, and signed by the parties so making or creating the same, or their agents, thereunto lawfully authorized by writing, shall have the force and effect of leases or estates at will only, and shall not, either in law or equity, be deemed or taken to have any other or greater force or effect, any consideration for making any such parol leases or estates, or any former law or usage to the contrary notwithstanding; except, nevertheless, all leases not exceeding the term of three years from the making thereof; and moreover, that no leases, estates or interests, either of freehold or terms of years, or any uncertain interest, of, in, to or out of any messuages, manors, lands, tenements or hereditaments, shall, at any time after the said April 10, 1772, be assigned, granted or surrendered, unless it be by deed or note, in writing, signed by the party so assigning, granting or surrendering the same, or their agents, thereto lawfully authorized by writing, or by act and operation of law.

The Statute of Frauds requires "a memorandum in writing signed by the parties to be charged which sufficiently indicates the terms of the contract and the property to be conveyed." *Brown v. Hahn*, 419 Pa. 42, 51, 213 A.2d 342, 347 (1965). Its aim "is the prevention of successful fraud by inducing the enforcement of contracts that were never in fact made. It is not to prevent the performance or the enforcement of oral contracts that have in fact been made." *In re Estate of Beeruk*, 429 Pa. 415, 418-19, 241 A.2d 755, 758 (1968) quoting 2 Corbin, Contracts § 498 at 680-81 (1950).  It eschews exalting "informality in the memorandum or its incompleteness in detail [which] neither promotes justice nor lends respect to the statute." *Axler v. First Newport Realty Investors*, 279 Pa.Super. 14, 18, 420 A.2d 720, 722 (Pa.Super.1980) citing *Beeruk,*

3

*supra*. Accordingly "some note or memorandum' that is adequate ... to convince the court that there is no serious possibility of consummating fraud by enforcement" will place the claim outside the statute of frauds. *Beeruk*, 429 Pa. at 419, 241 A.2d at 758.

While a number of cases have held that the Statute of Frauds bars oral agreement regarding real estate, *see, e.g.*, *Company of Old York Road*, 236 Pa. Super. 503, 345 A.2d 279 (Pa.Super.1975); *see also Atlantic Financial Federal v. Orianna Historic Associates*, 406 Pa.Super. 316, 594 A.2d 356 (Pa.Super. 1991); *Horanic v. Westmoreland County Tax Claim Bureau*, 1992 WL 510284 at *1 (Pa.Com.Pl. March 5, 1992); *Strausser v. Pramco, III*, 944 A.2d 761 (Pa.Super.2008); and *Hansford v. Bank of America*, 2008 WL 4078460 (E.D.Pa. August 22, 2008), one such case explained that the "writing requirement of the Statute of Frauds can be satisfied by the amalgam of multiple documents":

> The Statute of Frauds is satisfied by the existence of a written memorandum signed by the party to be charged and sufficiently indicating the terms of the oral agreement so that there is no serious possibility of consummating fraud by its enforcement. *Keil v. Good*, 467 Pa. 317, 356 A.2d 768 (1976). Any number of documents can be taken together to make out the necessary written terms of the bargain provided there is sufficient connection made out between the papers, without the aid of parol evidence, further than to identify papers to which reference is made, but not to supply a material term of the contract. Volume 4, Williston on Contracts, Third Edition, page 128. *See also Dvorak v. Beloit Corp.*, 65 Pa.D. & C.2d 514 (Chester 1974). The purpose of the Statute of Frauds is to prevent the enforcement of unfounded fraudulent claims by requiring that contracts pertaining to interests in real estate be supported by written evidence.

*Strausser v. PRAMCO, III*, 944 A.2d 761, 765 (Pa.Super. 2008) *quoting Haines v. Minnock Construction Co.*, 289 Pa.Super. 209, 433 A.2d 30, 33 (1981).

The Amended Complaint alleges the discovery of evidence which satisfies the Statute of Frauds. These proofs are alleged to consist of documentary evidence, written or otherwise, as well as corroborating deposition testimony.

*Documentary Evidence*

The complaint first alleges that on March 16, 2010, Bank's outside counsel emailed the draft forbearance agreement to a Bank officer. *See* Amended Complaint ¶ 70(1). On April 1, 2010, the Bank is alleged to have emailed the Office of Thrift Supervision regarding the Debtor's defaulted loan. That email is alleged to state that a forbearance agreement is being negotiated. *Id.* ¶ 70 (2) On April 13, 2010, an internal email is alleged to have circulated within the Bank that the forbearance agreement was about to be executed. *Id.* ¶ 70 (3) On April 22, 2010, another internal email within the Bank states that "the forbearance agreement has been drafted, but not given to the borrower to sign." *Id.* ¶ 70 (4). On May 10 and 20, 2010, the Bank prepared two customer review reports which mention that a forbearance agreement has been drafted. *Id.* ¶ 70 (5) Finally, it is alleged that 4th Walnut instructed the Bank to inform the Debtor that no forbearance agreement was reached; however, a draft of that letter originally contained an admission that such agreement was reached before it was deleted from the final version. *Id.* ¶ 70 (6)

*Corroborative Testimony*

In addition to documentary evidence, the amended complaint alleges that oral testimony confirms the existence of the forbearance agreement. First, the deposition of Edward Meditz, a former officer of the Bank, is alleged to acknowledge that the Bank

agreed to waive certain provisions in exchange for the Debtor depositing rent checks

with the Bank  Amended Complaint ¶ 72. Likewise, the deposition of Bonnie Golub,

Esquire, Bank's outside counsel, is alleged to contain an admission that an agreement

was reach albeit at materially different terms. *Id.* ¶ 73.

Taken together, the allegations of the existence of documents and deposition

testimony address the deficiencies which doomed the contract claim plead in the

original complaint. The original contract claim could not overcome the Statute of Frauds

defense because it was based on allegations of an oral agreement *unsupported by*

*anything in writing.* In the amended complaint, it is alleged that the Plaintiffs have

obtained in discovery documents and other evidence which facially support the claim

that some accord was reached between the Debtor and the Bank after the loan went

into default. It is clearly enough to surmount a Statute of Frauds challenge.

*Elements of a Contract*

Aside from affirmative defenses, the Defendants all maintain that Count I fails to

state a claim for breach of contract. To state a cause of action for breach of contract,

the plaintiff must allege: (1) the existence of a contract, including its essential terms; (2)

a breach of the duty imposed by the contract; and (3) damages resulting from that

breach. *Boyd v. Rockwood Area School District*, 907 A.2d 1157, 1165 (Pa. Commw.

2006). "While not every term of a contract must be stated in complete detail, every

element must be specifically pleaded." *Pennsy Supply Inc. v. American Ash Recycling*

*Corp.*, 895 A.2d 595, 600 (Pa. Super. 2006). "The elements of an enforceable contract

under Pennsylvania law are: (1) a manifestation of an intent to be bound by the terms of

the agreement, (2) sufficiently definite terms, and (3) an agreement supported by

6

adequate consideration." *Szymanski v. Sacchetta*, 2012 WL 246249, at *4 (E.D.Pa. Jan. 26, 2012) (citing *Johnston the Florist, Inc. v. TEDCO Constr. Corp.*, 441 Pa.Super. 281, 657 A.2d 511, 516 (Pa.Super.1995)). On these points, the Bank contends that the parties did not reach a meeting of the minds on all terms of their agreement. Bank's Brief, 16. Both the Bank and 4th Walnut maintain that the parties did not exchange legally sufficient consideration. Bank's Brief, 17; 4th Walnut's Brief, 15.

*Intent*

Mutual intent to be bound by an agreement usually manifests itself as "'an offer or proposal by one party followed by an acceptance by the other party.'" *Bayliss–Allen v. Cadence Design Sys., Inc.*, 2000 WL 1156857, at *4 (E.D.Pa. Aug. 16, 2000) (quoting Restatement (Second) of Contracts § 22(1) (1981)). The Bank maintains that the Plaintiff has failed to allege agreement on essential terms. This is demonstrated, it says, by the difference between the alleged oral terms and the written terms contained in the draft forbearance agreement attached to the complaint. *See* Bank's Brief, 16.

The Court disagrees with the Bank's reading of the draft forbearance agreement. That document is hardly inconsistent with what the amended complaint says were agreed-upon terms. Paragraph 20 of the amended complaint recites what the Plaintiffs understood to be the 12 essential terms agreed upon at their January 29 meeting with the Bank:

> (1) The Bank, by joint letter with Debtor, would withdraw its demand to collect the rents directly from the tenants and notify the tenants to pay the rents to the Debtor
>
> (2) The Debtor would open a new account at the Bank for the deposit of the rents from the Property;

(3) The Debtor would collect the rents from the Property, pay the operating expenses for the Property, and remit net cash to the Bank;

(4) The Debtor would provide monthly reporting to the Bank of receipts and disbursement;

(5) The Bank would explore retaining a marketing consultant (at Bank's cost) to assist in increasing occupancy of the Property;

(6) Default interest, the prepayment penalty and late charges were waived by the Bank;

(7) Contract rate of interest would be charged so long as there was no new event of default;

(8) The Debtor would increase occupancy at Property

(9) The term of the forbearance agreement would extend until December 31, 2010; however, if Debtor was in compliance with the agreement, the term would be extended to March 1, 2011;

(10) A deed in lieu of foreclosure would be escrowed;

(11) Turchi would reaffirm his guaranty; and

(12) The foreclosure complaint would be withdrawn.

Amended Complaint, ¶ 20. At least 9 of these terms are either expressly or implicitly found in the draft forbearance agreement: Term #1, redirection of rental payments back to the Debtor is implicitly provided for because the agreement requires the Debtor to remit net cash to the Bank after payment of operating expenses. Term #2, Debtor's opening of an account at the Bank, is provided in the agreement at ¶ 6. Term #3, Debtor's agreement to remit net cash after payment of operating expenses is found at ¶8b. Term #4, Debtor's duty to provide monthly reports, is found at ¶¶12(c), 15(b). Term #7, reinstatement of contract rate of interest, appears in ¶12(a). Term #8, increase in

occupancy, is provided for at ¶14. Term #10, the escrow of deed in lieu of foreclosure,

appears in ¶9. Term #11, Turchi's reaffirming of his guaranty, is reflected on the last

page where he is to sign *as a guarantor*. Term #12, the Bank's withdrawal of the

foreclosure action, appears at ¶10. Of the remaining three terms, only Term #6, waiver

of the prepayment penalty, is inconsistent with the forbearance agreement. There, the

prepayment penalty is itemized among the amounts due. As to Term #9, the length of

the forbearance agreement, there is but a slight difference as to how long the initial term

will last.[2] Finally, as to Term #5, the retention of a marketing consultant, the agreement

is silent. So, far from contradicting the terms orally agreed upon at the January 29

meeting, the forbearance agreement drafted by the Bank is largely consistent with it.

These allegations reflect agreement on essential terms.

*Consideration*

Both the Bank and 4th Walnut Defendants contend that Count I fails to allege

consideration. Consideration consists of a benefit to the promisor or a detriment to the

promisee." *I.K. ex rel. B.K. v. School District of Haverford Twp.*, 2013 WL 4194925, at *7

(E.D.Pa., Aug. 14, 2013). Paragraph 20 of the amended complaint alleges promises of

performance from both the Bank and the Debtor to the other. The Bank would not

foreclose and the Debtor would deposit rents with the bank. Interest would remain at the

contract rate but the Debtor agreed to increase occupancy. This agreement would

continue for the next 11 months but if the Debtor breached, the Bank would be entitled

to a deed in lieu of foreclosure. In sum, the Court finds that Count I alleges the

existence of an enforceable contract.

---

[2] The draft agreement states that the initial period of forbearance is 9 months (that is, until October 1, 2010). Debtor's recollection is that it would initially last until December 31, 2010, or 11 months. See ¶20.

*Bank's Breach*

Having found that a contract is alleged, the Court turns to whether the complaint pleads a breach of that agreement. The forbearance agreement entitled the Debtor to remain in the property until at least March 2011 if it met all of its responsibilities. *See* Amended Complaint, ¶ 20 and Ex. I, draft forbearance agreement, ¶11. The Plaintiffs allege that the Debtor fully performed under that agreement, yet notwithstanding, the Bank began secretly negotiating the sale of the loan to 4th Walnut in April 2010. *Id.*, ¶ 26, 32. At 4th Walnut's direction, the Bank denied that it entered into a forbearance agreement and sold the loan to 4th Walnut in June 2010. ¶¶ 45-50  4th Walnut then notified the Debtor that it was the holder of the note, accelerated the loan balance, and demanded payment of it as well as the monthly rental receipts. ¶51.

All of the foregoing is alleged to have been done in complete derogation of the forbearance agreement. This states a breach of the parties' agreement.

*Damages*

As a result of the Bank's breach, Plaintiffs allege three measures of damages: first, the Plaintiffs claim to have been forced to incur legal fees of $1.3 million; second, they demand restitution for the unjust enrichment on account of 4th Walnut's wrongful profit from purchasing the Debtor's loan; and third, and finally, Turchi demands damages sustained in the amount $2.4 million as to other projects of his, including increased financing costs. ¶ 80. Having alleged an enforceable contract, a breach of that contract, and resulting damages, the Court finds that the Count I states a cause of action for breach of contract.

*Counts III and IV –*
*Interference with Contract*

Because the cause of action in Count II (Conspiracy) is derivative of other

causes of action, the Court will pass over it at this time. The Court will first determine if

the Complaint elsewhere pleads an independent cause of action as to which a

conspiracy is alleged. *See In re Jamuna Real Estate, LLC*, 365 B.R. 540, 561

(Bkrtcy.E.D.Pa. 2005) (observing that civil conspiracy is a derivative cause of action).

The next two counts (III and IV) are tort claims directed against the 4th Walnut

defendants. The two claims are identical but for one important distinction: Count III

charges the 4th Walnut Defendants with harming an existing contractual relationship

(i.e., the alleged forbearance agreement between Debtor and Sovereign). Count IV

does not assume the existence of an enforceable agreement and instead alleges that

preliminary discussions were tending towards an agreement when the 4th Walnut

Defendants intervened.

Under Pennsylvania law, the elements of a cause of action for intentional

interference with a contractual relationship, whether existing or prospective, are: (1) the

existence of a contractual, or prospective contractual relation between the complainant

and a third party; (2) purposeful action on the part of the defendant, specifically intended

to harm the existing relation, or to prevent a prospective relation from occurring; (3) the

absence of privilege or justification on the part of the defendant; and (4) the occasioning

of actual legal damage as a result of the defendant's conduct. *BP Environmental*

*Services, Inc. v. Republic Services, Inc.,* 946 F.Supp.2d 402, 407 (E.D.Pa. 2013).

Pennsylvania has expressly adopted the Restatement (Second) of Torts, which states

that a necessary element of this tort is improper conduct by the alleged tortfeasor, here

11

the Defendants. *See Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 482 Pa. 416,

393 A.2d 1175, 1183 (1978); Restatement (Second) of Torts §§ 766-67.

4th Walnut challenges Count III in three respects: first, that there is no contract

alleged with which it could have interfered; second, that there is no allegation of an

action on its part that is sufficiently purposeful; and third, that there is no allegation of

harmful intent on its part that would likewise demonstrate purposeful action. 4th Walnut's

Brief, 21-23.

*Purposeful Action*

Because the Court has already found that the amended complaint pleads the

existence of a contract between the Debtor and the Bank, it may proceed on to the

remaining elements. The second point maintains that there is no allegation of

purposeful action on 4th Walnut's part which specifically intended harm. *See Phillips v.*

*Selig*, 959 A.2d 420, 429 (2008) (requiring that the defendant act with the "specific

purpose of causing the plaintiff harm). Pennsylvania courts have held that this tort is an

intentional one; the actor is acting as he does for the purpose of causing harm to the

plaintiff. *Glenn v. Point Park College*, 441 Pa. 474, 481, 272 A.2d 895, 899 (1971).  4th

Walnut maintains that this pleading does not allege purposeful action. It explains that

the Plaintiffs read too broadly the email communication alleged in ¶ 45 to allege

purposeful action. Rather, 4th Walnut reads what is in ¶ 45 as nothing more than a

request upon the Bank that it restate to the Debtor that no forbearance agreement ever

existed. 4th Walnut's Brief, 23. The Court finds this to be a very narrow reading which

obtains only outside of context. If the Court reads the allegations which both precede

and follow ¶ 45, it is further persuaded that Plaintiffs' reading of this email is the more

12

plausible. To begin with, ¶ 43 quotes a June 1, 2010 email which references the "Philly

Deal Snag." That is explained parenthetically to be the forbearance agreement:

> In a June 1, 2010 email, Archibald red-flagged what he
> termed a "Philly Deal Snag" (i.e. the Forbearance
> Agreement) that may cause a "legal" challenge to 4th
> Walnut's purchase of the loan:
>
> We've uncovered a couple of challenges today. One is
> financial and other legal. ***I don't want to write too much
> about the legal***, so I'll discuss with you tomorrow am.

See ¶ 43 [emphasis in original]. Paragraph 44 also quotes another email from 4th

Walnut to a Bank officer sent one hour later. That email acknowledges the potential

existence of a forbearance agreement:

> Bonnie [counsel for the Bank] did speak with our attorney
> today. She mentioned to him that you have been negotiating
> a forbearance agreement with Turchi as recently as the past
> few weeks and that correspondence has gone back and
> forth.

¶ 44. Two days after that, 4th Walnut is alleged to have told the Bank's counsel to do

two things: first, to explain to Debtor that no forbearance agreement was finalized and,

second, to have asked it to restart the foreclosure process:

> On June 3, 2010, the Defendants had a conference call to
> "flush out the issues" relating to the Forbearance agreement.
> During the call, 4th Walnut and the Bank agreed that they
> would disavow the existence of the Forbearance Agreement
> and in the process permit the 4th Walnut Defendants to
> trample the Plaintiffs' rights. To implement the first part of the
> strategy, the 4th Walnut Defendants requested that the Bank:
>
> send a letter to the borrower and the guarantor confirming
> that the loan is in default, that while a forbearance [*sic*] was
> discussed it was expressly conditioned upon senior
> management at the bank approving same, that these
> approval have not been obtained and that there is currently
> no forbearance agreement in place. …

13

Please confirm the bank is going to send the letter and
advise me if the bank will also send the 237.1 notice.

¶ 45.

What follows ¶ 45 shows that the Bank followed 4th Walnut's direction. Paragraph 46

alleges that the Bank's counsel followed 4th Walnut's directive and prepared and sent to

her client a draft of a letter from the Bank to the Debtor stating that there was no

forbearance agreement. ¶ 46 Importantly, the letter as originally drafted by Bank's

counsel referenced prior forbearance on the Bank's part. ¶ 47 The final version of that

letter which was sent to the Debtor's principal is alleged to have deleted any reference

to forbearance. Id. Taking all of these allegations together, the Court reads the

complaint to portray 4th Walnut as purposefully directing the Bank to disavow any

forbearance agreement which it had reached with the Debtor. These alleged acts reflect

an intention to obtain the loan free of defenses so that 4th Walnut could foreclose on the

mortgage and obtain the property. That sufficiently alleges intent to interfere on 4th

Walnut's part.

*Privilege or Justification*

That takes the Court to the question of whether the Plaintiffs sufficiently allege a

lack of privilege on the part of the Defendants in acting as they allegedly have. In the

context of tortious interference with contractual relation claims, "[t]he presence of a

privilege is not an affirmative defense, rather, the absence of such a privilege is an

element of the cause of action which must be pleaded and proven by the plaintiff."

*Bahleda v. Hankison Corporation*, 228 Pa.Super. 153, 156, 323 A.2d 121, 122-123

(1974) (internal citations omitted). The absence of privilege or justification element of a

14

claim for interference with contractual relations is closely related to intent. *Adler, Barish*,

supra, 482 Pa. at 432, 393 A.2d at 1183.

This absence of privilege or justification on the part of the defendant "is merely

another way of stating that the defendant's conduct must be improper." *Id.* This requires

an inquiry into the "mental and moral character of the defendant's conduct." *Brownsville*

*Golden Age Nursing Home, Inc. v. Wells*, 839 F.2d 155, 159 (3d Cir.1988) (internal

citation omitted). What is or is not privileged conduct in a given situation is not

susceptible of precise definition. *Adler, Barish*, 482 Pa. at 432-433, 393 A.2d at 1183-

1184 (internal citation omitted). "When a defendant acts at least in part to protect some

legitimate concern which conflicts with an interest of the plaintiff, a line must be drawn

and the interests evaluated." *Advent Systems Ltd. v. Unisys Corporation*, 925 F.2d 670,

673 (3d Cir.1991) (citing *Glenn v. Point Park College*, 441 Pa. 474, 272 A.2d 895

(1971)). The Supreme Court of Pennsylvania has approached this privilege issue by

considering whether the defendant's actions "are sanctioned by the 'rules of the game'

which society has adopted." *Adler, Barish*, 482 Pa. at 433-434, 393 A.2d at 1184. In

determining whether an actor's conduct in intentionally interfering with a contract or a

prospective contractual relation of another is improper or not, consideration is given to

the following factors:

> (a) the nature of the actor's conduct,
>
> (b) the actor's motive,
>
> (c) the interests of the other with which the actor's conduct
> interferes,
>
> (d) the interests sought to be advanced by the actor,

> (e) the social interests in protecting the freedom of action of
> the actor and the contractual interests of the other,
>
> (f) the proximity or remoteness of the actor's conduct to the
> interference and
>
> (g) the relations between the parties.

*Adler, Barish*, 482 Pa. at 433, 393 A.2d at 1184 (quoting Restatement (Second) of Torts

§ 767). The general thrust of this multi-factor analysis "is whether, upon a consideration

of the relative significance of the factors involved, the conduct should be permitted

without liability, despite its effect of harm to another." *Crivelli v. General Motors Corp.*,

215 F.3d 386, 395 (3d Cir. 2000)(citing *Adler, Barish, supra*, citing Restatement

(Second) of Torts § 767, cmt. b). The nature of the actor's conduct is a chief factor in

determining whether the conduct is improper. *Id.* (citing Restatement (Second) of Torts

§ 767, comment (c)). *Hospitality Associates of Lancaster, L.P. v. Lancaster Land

Development, L.P.*, 2008 WL 4444249, at *8 (E.D.Pa., sept. 30, 2008)

The Amended Complaint charges 4th Walnut with wrongly interfering with the

forbearance agreement which the Debtor reached with the Bank. Paragraph 98 alleges

that the 4th Walnut Defendants acted without privilege or justification." Specifically, 4th

Walnut is alleged to have known of the forbearance agreement, yet notwithstanding,

directed the Bank to deny its existence. See Amended Complaint ¶ 97. The reasons

they did so were because 4th Walnut intended to purchase the loan free of conditions.

¶¶ 42-44. Once 4th Walnut became the holder of the note, it demanded the accelerated

balance as well as the monthly rental payments. ¶ 51. That, of course, cannot be

reconciled with Debtor's alleged arrangement with the Bank. Under the alleged

forbearance agreement, the Debtor was to remain in the property until March 2011 if it

fully performed. ¶ 20. A balancing of the interests of 4th Walnut in buying the loan and the Debtor in relying on Sovereign's representations requires the Court to analyze the good faith of 4th Walnut in acting as it did. Certainly, there is nothing wrong with an investor buying a bad loan. What is actionable is the meddling with an alleged existing contract between the borrower and the original lender in order to obtain the loan without strings attached. Its conduct directly impacted the Debtor, adversely attempting to cut off its rights in the property after the Debtor had for the 3 months prior paid the Bank in good faith with the alleged honest belief that a final deal would be put down on paper. ¶ 26. It is alleged that 4th Walnut actively made sure that this did not happened by dictating a course of action to the Bank that essentially reversed course of how it was dealing with the Debtor. As alleged, the extent of 4th Walnut 's involvement is so adverse and direct as to be unquestionably unjustified. Thus, the Complaint does not portray 4th Walnut's actions as proper (i.e., privileged) in this context.

*Actual Damages*

That leaves the issue of whether actual damages are alleged to have resulted from 4th Walnut's conduct. Debtor alleges that in order to keep the property, it was forced to file for Chapter 11 bankruptcy relief. Amended Complaint ¶ 52. Moreover, it alleges, significant time has been spent and expense has been incurred in obtaining the information from the Bank which vindicates its contention that the property was subject to a forbearance agreement. ¶ 99. With regard to Mr. Turchi, it is alleged that based on his belief that the debtor had obtained forbearance he was able to refinance two other projects in the city. ¶ 53. Those refinancing lenders are alleged to have backed out after learning that the Debtor filed chapter 11. ¶ 80. While he is alleged to have eventually

secured new financing for those other properties, it is alleged to be at significantly
increased cost. ¶ 54. Count III pleads a claim for tortious interference with contract
against 4th Walnut.

*Interference with*
*Prospective Contract*

With but a slight variation, a claim for tortious interference with prospective
contracts involves the same elements as does a claim for tortious interference with an
*existing contract*. Having already found that the amended complaint sufficiently alleges
the second through fourth elements of an intentional interference claim as to an existing
contract, (i.e., purposeful action , absence of privilege, damages) the Court turns to
whether it alternatively alleges that a *prospective* contract was similarly thwarted.
"Defining a 'prospective contractual relationship' can be difficult." *Phillips v. Selig*, 959
A.2d 420, 428 (Pa.Super. 2008). "It is something less than a contractual right,
something more than mere hope." *Id.* (internal quotation marks omitted). To satisfy this
first element, a plaintiff must show that it is reasonably probable that, but for the
wrongful acts of the defendant, the plaintiff would have had a contractual relationship
with a third party. *See Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 412 A.2d
466, 471 (1979) quoting Glenn v. Point Park College, supra, 441 Pa. at 480-481, 272
A.2d. at 898-899.

If what is alleged does not rise to the level of a present contractual right, it
appears to certainly have given the Plaintiffs the impression that one would soon be
finalized. The Plaintiffs allege that they left the January 29 meeting with the belief that
the parties had agreed on the essential terms of forbearance. ¶ 20. They further allege
that the it was agreed that the Bank would put these terms in writing. ¶ 21. For the next

five months the Debtor alleges that it performed in accordance with what was agreed upon, and that it patiently awaited the forbearance agreement from Bank's counsel. ¶ 26. On several occasions in February and March 2010, Debtor's counsel contacted the Bank's counsel inquiring about the written forbearance agreement and was advised that it was forthcoming. ¶¶ 27 – 29. By mid-March 2010 Bank's counsel had written what she referred to as a "final draft" of a forbearance agreement which she sent to her client for review. ¶ 70(1). It is alleged then that the Bank as well as the Debtor thought that a binding contract was all but executed. The Court therefore finds that the amendment alleges a claim for intentional interference with prospective contractual relations.

*Conspiracy*

Having found that Count I states a breach of contract claim against the Bank and that Counts III and IV state a contractual interference claim against 4th Walnut, the Court addresses whether those counts support a conspiracy claim. Civil conspiracy requires "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." *Chantilly Farms, Inc. v. W. Pikeland Twp.,* 2001 WL 290645, at *13 (E.D.Pa., Mar. 23, 2001) (quoting *Smith v. Wagner,* 403 Pa.Super. 316, 322–23, 588 A.2d 1308, 1311–12 (Pa.Super.1991)); *see also Lum v. Bank of America,* 361 F.3d 217, 228 (3d Cir.2004) ("explaining that conspiracy to commit fraud is subject to Rule 9(b)").

*Combination*
*Of Persons*

To begin, the Court finds that Count II alleges a combination of two or more persons. Paragraph 45 alleges that on June 3, 2010, 4th Walnut and Sovereign agreed that the Bank would disavow the Forbearance Agreement. That paragraph alleges that they did so in order that the Bank could sell the loan and 4th Walnut could foreclose on the property. The common purpose is alleged to be removing the Debtor from the property.

*Overt Act*

Having assumed that this is alleged to have been done unlawfully (see *infra* discussion of other counts), the Court turns to whether an overt act is alleged toward that purpose. The Court refers to ¶¶ 45 through 51 wherein it is alleged that 4th Walnut requested that the Bank send the Debtor a letter falsely denying that the Bank ever agreed to forbear; that the Bank sent the Debtor such a letter; that the Bank sold the loan to 4th Walnut; and that 4th Walnut demanded full payment of the loan plus the rental receipts. Such allegations set forth clear and manifest conduct on the part of both defendants in furtherance of the alleged conspiracy.

*Actual Damages*

Finally, the conspiracy count must allege actual damages suffered by the Debtor as a result of the alleged conspiracy. Debtor alleges that it was forced to file bankruptcy to keep the building. ¶ 52. Turchi alleges that he was unable to refinance other construction projects as a result of having to place the Debtor in bankruptcy. ¶ 53. The

Court finds that Count II sufficiently states a claim for conspiracy against the Defendants.

*Tort Claims of Misrepresentation*

In addition to conspiracy, the Plaintiffs add two independent tort claims. Counts V and VI allege fraudulent and negligent misrepresentation on the part of the Bank. In response, the Bank makes three objections: first, that the claims are untimely; second, that the claims violate the economic loss and gist of the action doctrines; and third, that the two counts fail to state a claim upon which relief may be granted. Bank's Brief, 21-32.

*Timeliness*

Pennsylvania law provides for a two year statute of limitations applicable to tort claims. *See* 42 P.S. § 5524(7). The Bank reads the amended complaint to allege that the Plaintiffs were on notice of these tort claims as early as July 2010, yet did not file suit against the Bank until the Summer of 2013. That being more than three years after the limitations period began to run, it argues the tort claims against Sovereign are time-barred.

Plaintiffs offer two arguments in response. First, they invoke the doctrine of equitable tolling to explain any apparent tardiness. Second, they argue that amendments such as this one relate back in time for limitations purposes. Plaintiffs' Brief, 47-51. The Court finds the first of the two arguments to sufficiently refute the Bank's limitations challenge.

*Equitable Tolling*

"Equitable tolling of the limitations period is to be used sparingly and only in "extraordinary" and "rare" circumstances. *See Satterfield v. Johnson,* 434 F.3d 185, 195 (3d Cir.2006); *LaCava v. Kyler,* 398 F.3d 271, 274–75 (3d Cir.2005). It is only in situations "when the principle of equity would make the rigid application of a limitation period unfair" that the doctrine of equitable tolling is to be applied. *See Merritt v. Blaine,* 326 F.3d 157, 168 (3d Cir.2003). Generally, a litigant seeking equitable tolling must establish two elements: (1) that he has been pursuing his rights diligently; and (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuglielmo,* 544 U.S. 408, 418, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005). The Court's reading of the complaint leads it to conclude that while arguably the Bank's conduct put it on notice of a breach of contract claim, it definitely did not indicate a tort claim as well. Moreover, had the Bank not stonewalled the Plaintiff's subpoenas as alleged, Plaintiff would have learned of additional facts to support the tort claims well within the limitations period.

This is demonstrated by the following chronology: After the loan defaulted and foreclosure commenced, the parties met on January 29, 2010 to attempt a workout. ¶ 20 The Debtor left the meeting believing that an accord had been reached. ¶ 21 Memorialization of that agreement was left to Bank's counsel. *Id.* Months passed and still Bank's counsel had not sent a draft agreement to Debtor's counsel, despite promises to do so. ¶ 31 During this time, the Debtor continued to perform as agreed at the January 29 meeting. ¶ 26 In April 2010 the Bank began trying to sell the loan without telling the Debtor. ¶ 32 By May 2010 the Bank found a buyer in 4th Walnut. ¶ 41 In June, the Bank sent the Debtor a letter disavowing any forbearance on its part. ¶ 48

In July 4th Walnut, the new owner of the loan, notified the Debtor that it was accelerating the loan and demanded the rents. ¶¶ 51.

Because all of this concluded in the first week of July 2010, the Bank contends that Debtor had until July 2012 to bring any tort claims as a result thereof. In other words, the Debtor knew at that time that it had been defrauded. The Court rejects that premise. About all that can be concluded from what is alleged is that Debtor knew without doubt as of July 2010 that a breach of its contract with the Bank had occurred; however, it did not know with certainty whether it had a tort claim as of that time. This is because it could not know of the Bank's state of mind in July 2010. As the allegations set forth, the Debtor had been left in the dark as to what the Bank and 4th Walnut are alleged to have agreed to do in the run up to the sale of the Debtor's loan.  So while the Debtor would learn in June 2010 that the Bank repudiated any forbearance, there is no allegation that it knew at that time that it had been defrauded.

It would take the Debtor almost two years to obtain from the Bank the information sufficient to support tort claims. That information was requested via subpoena as early as one month after the bankruptcy filing. ¶ 57. While it produced some documents, the Bank withheld others invoking privilege, but without providing a privilege log. *Id.* That prompted the Debtor to serve another subpoena in July 2011. ¶ 61. This response was equally insufficient: the Bank again produced some documents and raised privilege as to others. Again, this was done without furnishing a privilege log. *Id.* Depositions of bank officers were taken in October 2011 from which the existence of responsive but unproduced documents came to light. ¶¶ 62-63. The Debtor filed a motion to compel which resulted in this Court 's July 11, 2012,Opinion which rejected the Bank's privilege

23

claim and required the production of previously withheld documents. *Id.* ¶ 65. Once the

Debtor obtained discovery of those documents, it moved in August 2013 for leave to

amend the complaint to allege tort claims. So far from portraying the Debtor as having

slept on its rights, the amendment alleges that it acted with dispatch when it learned of

tortious conduct. The statute of limitations, then, provides no bar to the Plaintiffs' tort

claims.

*Gist of the Action and*
*Economic Loss Doctrines*

The Bank next questions the nature of the tort claims. It explains that these

claims do no more than re-characterize the breach of contract claim. As such, explains

the Bank, the tort claims violate the "gist of the action" and "economic loss" doctrines.

The gist of the action doctrine precludes tort claims "1) arising between the parties; 2)

when the alleged duties breached were grounded in the contract itself; 3) where any

liability stems from the contract; and 4) when the tort claim essentially duplicates the

breach of contract claim or where the success of the tort claim is dependent on the

success of the breach of contract claim." *Reardon v. Allegheny Coll.,* 926 A.2d 477, 486

(Pa.Super.Ct.2007).[3] The economic loss doctrine "precludes recovery in tort if the

plaintiff suffers a loss that is exclusively economic, unaccompanied by an injury to either

property or person." *Bouriez v. Carnegie Mellon Univ.,* 430 Fed. Appx. 182, 187 (3d

Cir.2011). Accordingly, "a claim should be limited to a contract claim when the parties'

obligations are defined by the terms of the contracts, and not by the larger social

---

[3] The Pennsylvania Supreme Court has not adopted the gist of the action doctrine, but the Third Circuit Court of Appeals predicted that this doctrine would be adopted based on its consistent application in the Pennsylvania Superior Court. *Bohler–Uddeholm Am., Inc. v. Ellwood Grp., Inc.,* 247 F.3d 79, 103 n. 10 (3d Cir.2001) (citations omitted).

policies embodied by the law of torts." *Bohler–Uddeholm Am., Inc. v. Ellwood Grp., Inc.,*

247 F.3d 79, 104 (3rd Cir.2001) (internal quotation omitted).

In response, the Plaintiffs maintain that it would be premature to dismiss the tort

claims at this juncture. They explain that the inquiry is fact-intensive; therefore, a record

is necessary to determine if the tort claims stand independently. Plaintiffs' Brief, 46.

Moreover, say the Plaintiffs, parties are allowed to plead in the alternative. *Id.*, 47

The Court agrees with the Plaintiffs on this point. The inquiry is whether the tort

claims plead "freestanding causes of action" or nothing more than "illegitimate attempts

to procure additional damages for a breach of contract." *Bohler-Uddeholm* 247 F.3d at

103. The Court will analyze each tort claim against this standard.

*Fraudulent misrepresentation*

Under Pennsylvania law, a cause of action for fraudulent misrepresentation

consists of:

> (1) a representation; (2) which is material to the transaction
> at hand; (3) made falsely, with knowledge of its falsity or
> recklessness as to whether it is true or false; (4) with the
> intent of misleading another into relying on it; (5) justifiable
> reliance on the misrepresentation; and (6) the resulting injury
> was proximately caused by the reliance.

*Gibbs v. Ernst*, 538 Pa. 193, 647 A.2d 882, 889 (1994) (footnote and citations omitted.

Fraud claims are subject to a higher pleading standard. *In re Processed Egg Products*

*Antitrust Litigation*, 851 F.Supp.2d 867, 880 (E.D.Pa. 2013). As to a representation

made by the Bank, the Debtor alleges that it promised to send it a draft forbearance

agreement after the January 29 meeting and on numerous subsequent occasions

during the Spring of 2010. ¶¶ 21, 27-29, 31. As to whether such representations were

material, the amendment alleges that the Debtor continued to pay the Bank as agreed

at the January 29 meeting. ¶ 26. As to whether the representation was false, it is alleged that in the beginning of April 2010 the Bank began to try to sell the Debtor's loan. ¶¶ 31, 32 The Bank's intent to mislead the Debtor into relying on false representations is demonstrated by its failure to tell the Debtor that it was shopping the loan around. ¶¶ 33, 34. Debtor's reliance on the Bank's promises of forbearance are alleged to consist of its continued payments to the Bank. ¶ 26. Because it is alleged that Debtor was not informed of the Bank's sale of the loan until after the fact, its reliance was justified. ¶ 51. The harm that both Plaintiffs sustained as a result of its reliance—in the Debtor's case having to file a bankruptcy petition (¶ 52) and in Turchi's case having to find alternative financing for other projects (¶¶ 53, 54)—were proximately caused by believing the Bank's representations. In sum, the Court finds Count V to state a claim for fraudulent misrepresentation.

*Negligent Misrepresentation*

Alternatively, the amended complaint charges the Bank with *negligently* misrepresenting its intentions with regard to the Debtor's loan. Under Pennsylvania law, the elements of negligent misrepresentation are (1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation. *Milliken v. Jacono*, 60 A.3d 133, 141 (Pa.Super.2012). "The elements of negligent misrepresentation differ from intentional misrepresentation in that the misrepresentation must concern a material fact and the speaker need not know his or her words are untrue, but must have failed to make a reasonable investigation of the truth of these words." *Heritage Surveyors &*

*Engineers, Inc. v. National Penn Bank,* 801 A.2d 1248, 1252 (Pa.Super.2002),

(emphasis added) quoting *Kramer v. Dunn,* 749 A.2d 984, 991 (Pa.Super.2000)

"Moreover, like any action in negligence, there must be an existence of a duty owed by

one party to another." *Id.*

The close similarity of the elements of the two causes of action causes the Court

to conclude that Count VI states a cognizable claim. The misrepresentation that is

alleged is the Bank's purported intention to abide by its assurances of forbearance

when it was trying to sell the loan. ¶ 32, 33. That such a fact is material is alleged by the

Debtor's own forbearance from filing bankruptcy based on those assurances. ¶18 That

the Bank knew that it was not being candid with the Debtor is demonstrated by its

alleged need for secrecy regarding the loan sale. ¶¶ 33, 34. It is alleged that it did so to

keep the Debtor paying on the loan. ¶ 33. For its part, Debtor says it had no reason to

suspect that the Bank intended to renege on forbearance, so it continued to pay the

Bank in good faith.  ¶¶ 21, 26- 29, 31. These allegations state a claim for negligent

misrepresentation.

*Aiding and Abetting*

Count VII alleges that 4th Walnut aided and abetted the Bank's fraud. That cause

of action derives from the Restatement of Torts and provides:

> For harm resulting to a third person from the tortious conduct
> of another, one is subject to liability if he
>
> (a) does a tortious act in concert with the other or pursuant
> to a common design with him, or
>
> (b) *knows that the other's conduct constitutes a breach of
> duty and gives substantial assistance or encouragement to
> the other so to conduct himself,* or

27

> (c) gives substantial assistance to the other in accomplishing
> a tortious result and his own conduct, separately considered,
> constitutes a breach of duty to the third person.

Restatement (Second) of Torts § 876 (emphasis added). *See also Thompson v.
Glenmede Trust Co.,* 1996 WL 529696, at *2 n. 6 (E.D.Pa.1996) (noting that though the
Pennsylvania Supreme has not adopted the aiding and abetting tort, it has not rejected
it either, thus the claim survives a motion to dismiss). In applying Pennsylvania law the
Third Circuit noted that Restatement § 876 suggests six factors to determine whether a
defendant rendered substantial assistance for purposes of accomplice liability:

> i. the nature of the act encouraged;
>
> ii. the amount of assistance given by the defendant;
>
> iii. the defendant's presence or absence at the time of the
> tort;
>
> iv. the defendant's relation to the other tortfeasor;
>
> v. the defendant's state of mind; and
>
> vi. the foreseeability of the harm that occurred.

*Fassett v. Delta Kappa Epsilon,* 807 F.2d 1150, 1163 (3d Cir.1986) (quoting
Restatement (Second) of Torts, § 876(b), comment d).

4th Walnut raises two challenges to the Court: first, that the Plaintiffs fail to allege
an underlying fraud claim; and second, that they fail to allege any aiding or abetting on
4th Walnut's part. Because the Court has already found sufficient allegations of fraud,
it will proceed directly to the question of whether aiding and abetting is alleged.

In this regard, 4th Walnut contends that the amendment pleads neither that 4th
Walnut gave substantial assistance to the Bank, nor that it was aware of the Bank's
fraudulent misrepresentations. See 4th Walnut's Brief, 25-26. In the way of assistance,

4th Walnut reads the amendment to allege only that it agreed with the Bank that there

was no forbearance agreement and that the Bank should confirm that fact with the

Debtor. As a corollary to that conclusion, 4th Walnut maintains that there is no

allegation that 4th Walnut knew that it was assisting in the breach. Plaintiffs dispute 4th

Walnut's readings of these allegations. To the contrary, they maintain, the complaint

alleges that after discovering the existence of the forbearance agreement, 4th Walnut

advised the Bank to disavow that agreement so that it could sell the loan. Plaintiffs'

Brief, 45.

The Court agrees that this count pleads the element of aiding and abetting. It is

only by reading ¶ 45 of the amendment out of context that 4th Walnut's reading is

plausible. Although the Debtor did not cite which subsection of Restatement § 876 is

implicated, the allegations are consistent with (b):

> knows that the other's conduct constitutes a breach of duty
> and gives substantial assistance or encouragement to the
> other so to conduct himself

It is alleged that a forbearance agreement was reached. ¶ 20. That agreement gave rise

to a duty on the part of the Bank to abide by the agreement. 4th Walnut learned of that

agreement when it performed due diligence. ¶¶ 37-38 It referred to that agreement from

its perspective, euphemistically, as the "Philly deal snag." ¶ 43 Using that term indicated

that 4th Walnut knew that the Bank was compelled to abide by the agreement.

Notwithstanding, it advised the Bank to "confirm" that no such deal existed when it is

alleged that it very much did. ¶ 45. While what it is alleged to have been said during the

conference call regarding disavowal of the agreement may not rise to the level of

"substantial *assistance*," it could certainly constitute "substantial *encouragement*." This adequately states a claim for aiding or abetting another's fraud.

*Remedies*

The 4th Walnut defendants object to the Plaintiffs' demand for non-compensatory relief. They challenge any claim to punitive damages or to restitution. Punitive damages cannot be demanded, they urge, because the amended complaint fails to allege conduct that is sufficiently outrageous. 4th Walnut's Brief, 28. As to equitable relief, they argue that the Debtor has failed to plead any facts indicating that the Debtor conferred any benefit—an element of a cause of action for unjust enrichment— on the 4th Walnut Defendants. Id., 28-29. Plaintiffs counter that their demand for punitive damages is based on allegations of intentional malicious and outrageous conduct. *Id.*, 52 citing ¶ 81. Their restitution plea, they state, is based on Pennsylvania law which provides that restitution damages are "available … for a breach of a contract." *Id.,*51.

*Punitive Damages*

Under Pennsylvania law, "punitive damages are appropriate for torts sounding in negligence when the conduct goes beyond mere negligence and into the realm of behavior which is willful, malicious, or so careless as to indicate wanton disregard for the rights of the parties injured." *Hutchinson v. Luddy*, 582 Pa. 114, 870 A.2d 766, 770 (Pa.2005). Punitive damages should be awarded only where the defendant's conduct is "so outrageous as to demonstrate willful, wanton, or reckless conduct." *Id.*; *see also* Restatement (Second) of Torts § 908. To state a claim for punitive damages under Pennsylvania law, "the pleadings must allege facts sufficient to demonstrate evil motive or reckless indifference to the rights of others." *Mulholland v. Gonzalez*, 2008 WL

5273588, at *2 (E.D.Pa. Dec. 18, 2008) quoting *Great West Life Assurance Co. v. Levithan*, 834 F.Supp. 858, 864 (E.D.Pa.1993).

4th Walnut downplays the seriousness of the allegations against it. Taking all the allegations as true, and giving the Debtors the benefit of the doubt where things are unclear, the purposeful interference may not constitute evil, but it would certainly rise to the level of reckless indifference to the Debtor's rights. That constitutes, at a minimum, wrongful conduct. Whether that in fact occurred will be allowed to develop in discovery and trial. *See Young v. Westfall*, 2007 WL 675182, at *2 (M.D.Pa. March 1, 2007) (noting that dismissal of a punitive damages claim at the pleading state is premature because even though "facts may later prove at most that defendants were merely negligent, discovery is necessary to help make this determination."); *Farrell v. County of Montgomery*, 2006 WL 166519, at *2 (E.D.Pa. January 18, 2006) (denying motion to dismiss punitive damages claim where no discovery had been taken to evaluate Defendant's state of mind). Accordingly, the request to dismiss the demand for punitive damages must be denied (without prejudice) at this time.

*Restitution*

4th Walnut objects not only to the degree of damages, but as to their nature as well. It maintains that the Plaintiffs alternatively demand restitution, yet fail to allege the requisite element; to wit, a benefit which was conferred by the Plaintiff. 4th Walnut's Brief, 28-29. Plaintiffs maintain that restitution damages are available in Pennsylvania for a breach of contract. Plaintiffs' Brief, 51.

Pennsylvania law supports an award for restitution as to contract as well as tort claims. The Third Circuit has held that "damages under a theory of restitution provides

an appropriate form of relief in many contract cases." *ATACS Corp. v. Trans World Communications*, 155 F.3d 659, 669 (3d Cir. 1998) citing *Fidelity Fund, Inc. v. DiSanto*, 347 Pa. Super. 112, 500 A.2d 431, 438 (1985). Likewise, the Restatement (Third) of Restitution provides that

> If a deliberate breach of contract results in profit to the defaulting promisor and the available damage remedy affords inadequate protection to the promisee's contractual entitlement, the promisee has a claim to restitution of the profit realized by the promisor as a result of the breach. Restitution by the rule of this section is an alternative to a remedy in damages.

Restatement (Third) of Restitution § 39(1). As well, restitution may provide a remedy in tort claims:

> (1) A person who obtains a benefit by conscious interference with a claimant's legally protected interests (or in consequence of such interference by another) is liable in restitution as necessary to prevent unjust enrichment, unless competing legal objectives make such liability inappropriate.
>
> (2) For purposes of subsection (1), interference with legally protected interests includes conduct that is tortious, or that violates another legal duty or prohibition (other than a duty imposed by contract), if the conduct constitutes an actionable wrong to the claimant.

*Id.*, § 44(1), (2). The Court has found no controlling authority adopting or rejecting these restatement provisions; but at this juncture of the proceeding, it would be premature to preclude an alternative theory of damages.

*Standing*

The Bank argues that Turchi lacks standing to be a Plaintiff in this case. It argues that he is asserting damages sustained not by himself but, rather, the entities which he

owns or controls. Bank's Brief, 32-33. The Debtor's response is that Turchi is listed among the signatories to the forbearance agreement. Among the terms agreed upon at the January 29 meeting was Turchi reaffirming his guaranty of the loan. See Amended Complaint ¶ 20.

Standing has been described as the "irreducible constitutional minimum." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). Its essence is injury; Article III standing requires that "(1) the plaintiff must have suffered an injury in fact-an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical ; (2) there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Township of Piscataway v. Duke Energy,* 488 F.3d 203, 208 (3d Cir.2007) (citing *Trump Hotels & Casino Resorts v. Mirage Resorts,* 140 F.3d 478, 484–85 (3d Cir.1998)).

*Turchi* Qua *Guarantor*

While it is alleged that Turchi was to sign the forbearance agreement, he was to do so as a guarantor. That capacity is not without significance. This lawsuit does not seek enforcement of the guarantee. Indeed, it is the Debtor as the primary borrower who has brought it against the lender, the primary obligee. The Court does not read the complaint to allege that Turchi *qua guarantor* personally suffered a concrete injury as a result of what the Bank is alleged to have done. *See e.g., Borough of Berwick v.*

*Quandel Group, Inc.*, 440 Pa.Super. 367, 371, 655 A.2d 606, 608 (Pa.Super.1995)

(holding that borough that guaranteed debt owed by municipal sewage authority to

engineering firm lacked standing because it was not party to the contract); *see also*

*Hufsmith v. Weaver*, 285 Ark. 357, 360, 687 S.W.2d 130, 132-133 (1985) (holding that

majority shareholder who guaranteed debt was not a third party beneficiary and thus

lack standing to bring action for tortious interference of corporation's contract with

defendant).

*Turchi's Capacity to Sue*

If Turchi's alleged status as a guarantor might not convey standing in this case,

his alleged ownership interests in other businesses does. The amendment alleges that

his other construction companies were harmed as a result of the Bank's alleged

breaches. ¶¶53,54,80. The Bank, however, maintains that only those entities, and not

Turchi, have standing to allege claims of collateral injury. Bank's Brief, 32.

It is a little unclear whether Mr. Turchi or his companies are the proper party

plaintiffs in this proceeding. This lack of clarity is due to the fact that the amendment

does not explain precisely Mr. Turchi's interest in those entities. All the complaint says

is the he has a "controlling interest" in these entities. ¶ 11. In its Brief, however, the

Bank explains that he is "a shareholder of the general partner of each limited

partnership and a limited partner in each partnership." Bank's Brief, 32. The Court finds

these allegations to allow a reasonable inference that Mr. Turchi's other companies are

limited partnerships. Assuming that is true, the applicable rule of procedure provides

that a partnership's capacity to sue is determined by the law of the state where the court

is located. *See* F.R.C.P. 17(b)(3) made applicable by B.R. 7017. The applicable

34

Pennsylvania rule of court requires that "a partnership having a right of action shall prosecute such right in the names of the then partners trading in the firm name." Pa.R.C.P. 2127(a). For purposes of that rule, a "partner" means "only a general partner or a limited partner who has become subject to liability of a general partner." Pa.R.C.P. 2126. As the general partner of these companies, Mr. Turchi would have the capacity to sue on their behalf.[4]

As the representative of these other entities, Mr. Turchi has alleged an injury for which redress is sought. The refinancing which he is alleged to have obtained for these ventures was withdrawn once word got out that the Debtor was placed in Chapter 11. ¶ 53. Mr. Turchi estimates that his other projects have sustained damages in excess of $2.5 million on account of the Bank's conduct. ¶ 80(c). The amendment thus alleges standing on Mr. Turchi's part.

*Turchi and the*
*Statute of Limitations*

The Bank's final challenge as to Turchi's tort claims also raise timeliness. For the same reason that the Court has denied the limitations challenge as to the tort claims raised by the Debtor, it does so as to Turchi. The record in this case has established that evidence supporting the tort claims was concealed by the Bank. Once the Bank was compelled to turn over all documents responsive to discovery requests, and after it did so, only then did the Debtor and Turchi learn of facts supporting tort claims. They promptly moved for leave to amend the complaint to allege tort claims.

---

[4] In the event that discovery unearths evidence demonstrating a different ownership interest that would disqualify Mr. Turchi from plaintiff status, the Bank may renew its objection.

35

*Ivy Realty Defendants*

At the conclusion of the oral argument, counsel for the 4th Walnut defendants asked the Court to dismiss the case as against the two defendants Ivy Realty, LII, LLC and Ivy Realty Services, LLC. Such request was not part of the 4th Walnut Defendants' written motion. Rule 7 of the Federal Rules of Civil Procedure requires that such a request be made in writing. See F.R.C.P. 7(b)[5] (requiring that request for court order be made by motion which must be in writing unless made during a hearing or trial) An argument on a motion is not a "trial" or a "hearing" for purposes of the exception in subdivision (b) of Rule 7 permitting oral motions to be made only at trials and hearings. *Shapiro v. Freeman*, 38 F.R.D. 308, 309 n.2 (S.D.N.Y. 1965). For that reason, a request to dismiss the Ivy Realty Defendants is denied.

*Conclusion*

The Plaintiffs' claims in Counts I through VII of the Amended Complaint are sufficiently pled. The Defendants' Motions to Dismiss are denied.

By the Court:

_____
Stephen Raslavich
United States Bankruptcy Judge

Dated: <u>March 12, 2014</u>

---

[5] Made applicable by B.R. 7007.